*Fraternal Order of Police, Montgomery County Lodge 35, et al. v. Montgomery County, Maryland, et al.*, No. 67, September Term 2013

**LOCAL GOVERNMENT – COLLECTIVE BARGAINING**
Under the Police Labor Relations Act ("PLRA") of the Montgomery County Code, the County Executive and a representative of the Fraternal Order of Police, Montgomery County Lodge 35 ("FOP"), must negotiate certain employee benefits. After an agreement is reached through the negotiation or "impasse procedure," the County Executive presents the collectively-bargained agreement ("CBA") to the County Council (the "Council"), which has the authority to choose to fund, or to refuse to fund, the CBA. If the Council indicates in writing that it will refuse to fund the CBA in full or in part, the negotiating parties are given a nine-day period of time thereafter to attempt to re-negotiate an agreement acceptable to the Council. In the present case, the Council indicated that it would refuse to fund several provisions in the CBA for fiscal year 2012 due to budgetary concerns, but the parties were unable to re-negotiate an agreement. The Court of Appeals held that, under such circumstances, the Council's refusing to fund certain provisions, and thereby changing the terms of the CBA, was not in violation of the PLRA.

Circuit Court for Montgomery County
Civil Case No. 349201
Argued: 11 March 2014

IN THE COURT OF APPEALS

OF MARYLAND

No. 67

September Term, 2013

_____

FRATERNAL ORDER OF POLICE,
MONTGOMERY COUNTY LODGE 35,
ET AL.

v.

MONTGOMERY COUNTY, MARYLAND,
ET AL.

_____

Barbera, C.J.,
Harrell,
Greene,
Adkins,
McDonald,
Rodowsky, Lawrence F. (Retired,
          Specially assigned),
Wilner, Alan M. (Retired,
          Specially assigned),

JJ.

_____

Opinion by Harrell, J.

_____

Filed: April 18, 2014

"Proximity to power deludes some into thinking they wield it," observed the character Francis Underwood, portrayed by Kevin Spacey, in the U.S.-version of the television series "House of Cards." Petitioner here, the Fraternal Order of the Police, Montgomery County Lodge 35 ("FOP"), fell under such a spell in maintaining this litigation. The Police Labor Relations Act ("PLRA") of the Montgomery County Code grants the FOP a proximity to power in requiring the County Executive to negotiate certain employee benefits with a representative of the FOP. Despite this proximity, the FOP lacks actual power under the PLRA because, as the well-known adage provides, "he who holds the purse strings rules the roost." Under the PLRA, the County Council (the "Council") in Montgomery County holds the purse strings (*i.e.*, the actual power) *each* fiscal year when it approves the budget.

Thus, we hold that the Council acted in this case within its authority under the PLRA in deciding not to fund fully—and, thereby, to "change"—certain benefits in the pre-existing collectively-bargained agreement, at least where the "changes" are fiscal in nature and the County Executive and the FOP did not submit a re-negotiated agreement to the Council.

## I. THE UNIVERSE OF DISCOURSE: THE PLRA

This litigation centers on whether the Council (and, thereby, the County) violated the requirements of the PLRA, codified at §§ 33-75 to 33-85 of the Montgomery County Code (2004) ("MCC"). The PLRA was enacted to implement the mandate in

§ 510 of the Charter of Montgomery County, Maryland ("County Charter")[1] and governs negotiations between Montgomery County (the "County") and members of its police force over collective bargaining agreements and amendments to those agreements. Specifically, it requires that a "certified employee organization[2] and the employer[3] . . . bargain collectively" on a number of subjects, such as wages, employee benefits, and the process for settling grievances. MCC § 33-80(a). "[T]o bargain collectively" is defined as "to meet at reasonable times and places and to negotiate in good faith . . . ." MCC § 33-76. If the parties cannot reach an agreement, the PLRA requires the parties to submit to an "impasse procedure" in which a neutral arbitrator chooses one side's proposed contract for submission to the Council for its consideration. MCC §§ 33-81(b); 33-80(g).

Once an agreement is reached, regardless of whether the terms are achieved through negotiation or the "impasse procedure," the County Executive submits the collectively-bargained agreement to the Council. MCC § 33-80(g). Then, the Council must "indicate by resolution of its intention to appropriate funds for or otherwise implement the agreement **or its intention not to do so**, and shall state its reasons for any intent to reject any part of the agreement" on or before May 1 of each year. MCC § 33-

---

[1] Section 510 provides: "The Montgomery County Council shall provide by law for collective bargaining with binding arbitration with an authorized representative of the Montgomery County police officers. Any law so enacted shall prohibit strikes or work stoppages by police officers."

[2] A "certified representative" is defined as "an employee organization selected in accordance with this chapter to represent a unit." MCC § 33-76.

[3] The "employer" is defined as "the county executive and the Executive's designees." MCC § 33-76.

80(h) (emphasis added). The May 1 deadline may be deferred to any date not later than May 15 by a majority vote of the Council taken on or before May 1.

If the Council indicates by resolution its intention not to appropriate funds for or otherwise implement the agreement, certain procedures provided in MCC § 33-80(h) are engaged. First, the Council must "designate a representative to meet with the parties [the County Executive and the representative of the FOP] and present the Council's views in their further negotiations . . . [and] in any ensuing impasse procedure." MCC § 33-80(h). The parties are to "meet as promptly as possible and **attempt to negotiate** an agreement acceptable to the Council." *Id.* (emphasis added). As part of this re-negotiation process, "[e]ither of the parties **may initiate** the impasse procedure set forth in Section 33-81." *Id.* (emphasis added). The results of the re-negotiations or impasse procedure must be submitted to the Council on or before May 10 (or by the postponed deadline if the Council deferred the May 1 deadline for indicating its intent).

Additionally, the PLRA contemplates procedures for not just single year agreements, but also multi-year agreements. First, the requirements for the Council's review and indication of intent in subsection (h) apply also "to Council review of wage or benefits adjustments after the first year of any multi-year agreement." MCC § 33-80(j). The PLRA envisions also that the Council will refuse to fund certain provisions for adjustments from time to time and requires that "any agreement shall provide either for automatic reduction or elimination of conditional wage or benefit adjustments if . . . sufficient funds are not appropriated for any fiscal year when the agreement is in effect." MCC § 33-80(i).

3

## II.    THE PRESENT DISPUTE.

In November 2010, the FOP and County Executive entered into negotiations over amendments to the pre-existing, two-year, collectively-bargained agreement covering fiscal years 2011 ("FY 11") and 2012 ("FY 12") (hereinafter, "CBA").[4]  Article 31 of the CBA provided for a limited "reopener" on changes to cash compensation for FY 12, the second year of the CBA.  The parties were unable to reach an agreement and proceeded to the impasse procedures in MCC § 33-81.  The impasse neutral determined that the FOP's offer proposing a 3.5% wage increase for service and longevity increments (conditioned upon funding by the Council) was more reasonable than the County's offer.  Thus, the resulting CBA provided for the conditioned wage increase.  *See* MCC § 33-81(b)(7) ("The offer selected by the impasse neutral, integrated with the previously agreed upon items, shall be deemed to represent the final agreement between the employer, and the certified representative . . . .").  The other terms in the pre-existing CBA, including the employment benefits at issue in this case, were not affected by the impasse neutral's decision and were to continue to apply in FY 12.  On 1 April 2011, the County Executive submitted the details of the "reopener" agreement (*i.e.*, the conditioned

---

[4] The pre-existing CBA for FY 2011 and FY 2012, for example, states:

> [A]ny wage and/or benefit adjustment set forth in this Agreement which requires the Montgomery County Council to take action necessary to implement the Agreement, or to appropriate funds, shall be **automatically reduced or eliminated** if the County Council fails to take the necessary action to implement the Agreement, or if funds are not appropriated or if a lesser amount is appropriated.

CBA Art. 48 (emphasis added).

4

wage increase) to the Council and, pursuant to MCC § 33-80(g),[5] included the 3.5% wage increase as part of its proposed operating budget for FY 12.

In preparing for the FY 12 budget, the County's Office of Management and Budget (OMB) provided the Council with a "Fiscal Impact Statement," which, *inter alia*, compared the cost of funding the employment benefits as described in the CBA for FY 12 with that of funding a less generous level of benefits as proposed by the County Executive in his FY 12 recommended operating budget.[6]  The Fiscal Impact Statement

---

[5] Subsection (g) provides:

***Submission to Council.***  A ratified agreement shall be binding on the employer and the certified representative, and shall be reduced to writing and executed by both parties.  In each proposed annual operating budget, the County Executive shall describe any collective bargaining agreement or amendment to an agreement that is scheduled to take effect in the next fiscal year and estimate the cost of implementing that agreement.  Any term or condition of a collective bargaining agreement which requires an appropriation of funds or enactment, repeal or modification of a County law shall be timely submitted to the County Council by the employer by April 1, unless extenuating circumstances require a later date.  . . . The employer shall make a good faith effort to have such term or condition implemented by Council action.  Each submission to the Council shall include:
(1) all proposed legislation and regulations necessary to implement the collective bargaining agreement;
(2) all changes from the previous collective bargaining agreement, indicated by brackets and underlines or a similar notation system; and
(3) all side letters or other extraneous documents that are binding on the parties.

MCC § 33-80(g).

[6] It may not be appropriate for the County Executive to end-run the PLRA requirements in this manner, if one assumes the accuracy of the OMB Statement.  As the Court of Special Appeals held in *Fraternal Order of Police, Montgomery County Lodge 35 v. Montgomery County Executive*, 210 Md. App. 117, 62 A.3d 238 (2013), under the
(Continued…)

5

concluded that funding employment benefits as described in the CBA would cost $3,960,090 more in FY 12 than funding benefits at the level recommended by the County Executive.

On 9 May 2011, the Council adopted Resolution No. 17-119, stating its intent to reject funding the arbitration award *and* three other contract provisions in the pre-existing CBA. The Resolution provided specifically, as follows:

> The County Council intends to reject full funding and disapprove the following contract provisions:
> 1. 3.5% service and longevity increments for bargaining unit members.

---

(…continued)

PLRA, the Montgomery County Executive must include the terms of the collective bargaining agreement with the police union in its proposed budget, as well as provide sufficient funding in its proposed budget to implement the final collective bargaining agreement. *See also* MCC § 33-80(g) (requiring the County Executive to include "all proposed legislation and regulations necessary to implement the collective bargaining agreement" in each submission to the Council and to "make a good faith effort to have such term or condition implemented by Council action").

In this case, it appears that the County Executive included in his proposed budget the amended terms pursuant to the reopener arbitration award, but deleted other, pre-existing provisions of the two-year CBA that should have extended into FY 12 automatically, unless the *Council* refused to fund the benefits fully. The County Executive is bound by the negotiated agreement. We do not wade further into these cloudy waters, however. The FOP did not challenge the propriety of the County Executive's actions, but rather focused its complaint solely upon the Council's conduct. Moreover, the record does not contain the County Executive's proposed budget. The only reference to the fact that the County Executive's proposed budget may have been contradictory to the pre-existing CBA is in the OBM's "Fiscal Impact Statement," which stated:

> The County Executive's FY12 recommended operating budget is inconsistent with the arbitrated awards for . . . FOP. . . . Instead, the County Executive recommends restricting employee compensation by modifying the cost sharing arrangements for the County's Government's health insurance and retirement plans and reducing certain group insurance benefits coverage.

6

2. Retirement benefits for bargaining unit members.
3. Health, dental, vision, and prescription drug benefits for bargaining unit members.
4. Life and long-term disability insurance benefits for bargaining unit.

Pursuant to the time deadlines set forth in MCC § 33-80(h), when the Council did not indicate by resolution its intent not to appropriate funds until May 9 (eight days after the May 1 deadline), the deadline for the FOP and the County Executive to submit a re-negotiated agreement was extended automatically to May 18.

Pursuant to MCC § 33-80(h), after the issuance of the resolution, the parties (the County Executive as employer and the FOP representative) met with the Council's representatives (Council President Valerie Ervin and Council Vice-President Roger Berliner) to attempt to re-negotiate an agreement acceptable to the Council. Thereafter, on May 16, the Council e-mailed the FOP representative, stating:

> We appreciate the FOP's willingness to work with the Council to help produce a balanced budget. As you know, the Council's role in collective bargaining negotiations is limited to meeting with the parties to explain our reasons for not accepting or funding certain provisions of your collective bargaining agreement. In our meetings over the last week, we explained our position and presented you with the Council's proposed plan for employee compensation and benefits, which significantly lessens the burden on all County employees and moves further toward achieving equity with employees of all County-funded agencies. **Because of our deadline to adopt the annual budget, the Council will vote on these compensation and benefits proposals tomorrow [Tuesday, May 17], and we will take our overall votes on the operating budget on Thursday [May 19].** As you know, the Executive, as the employer, must negotiate with the FOP over terms and conditions of employment. Your counter-proposals are interesting, and to the extent they involve mandatory topics of bargaining the Executive should be ready to address them during future negotiating sessions after this budget is completed. The Council will look forward to seeing the result of those negotiations. In the short-term, the Council's Government Operations and Fiscal Policy Committee expects to consider possible changes to the retirement plans for new employees in

7

June. We would greatly appreciate your input during this legislative process.

(Emphasis added.) Two days later, on the May 18 deadline, the Director of the County's Office of Human Resources, Joseph Adler, sent an e-mail to the Council's representatives informing them that the negotiating parties had not reached a re-negotiated agreement.

On 26 May 2011, the Council adopted Resolution No. 17-149, an Operating Budget for FY 12 for the CBA. The changes to the CBA were summarized in Paragraph 17 and detailed in Paragraph 66 of Resolution No. 17-149. Of relevance in this case, Resolution No. 17-149 "changed" three contract provisions for FY 12 in the pre-existing CBA (specifically, the retirement benefits; health, dental, vision, and prescription drug benefits; and life and long-term disability insurance benefits).[7] The FOP summarized the relevant changes (in an undisputed manner) as follows:

### Term Life Insurance and Accidental Death and Dismemberment Benefits

*Existing collective bargaining agreement:* Collectively-bargained terms for Term Life Insurance coverage and Accidental Death and Dismemberment benefits by which an officer received a life insurance benefit equal to two times his/her annual salary.

*Resolution No. 17-149:* The terms for the collectively-bargained Term Life Insurance coverage and Accidental Death and Dismemberment benefits for the affected Montgomery County police officers *were changed* in that an officer will now receive a life insurance benefit equal to only one year of his/her annual salary with the right, at the officer's expense, to add an additional amount equal to his/her annual salary.

---

[7] The FOP acknowledges that the Council has the authority to choose to fund fully or partially or to refuse to fund the negotiated re-opener agreement and, thus, conditioned their proposal explicitly on the Council's funding. Accordingly, the FOP does not dispute the Council's refusal to fund the 3.5% service and longevity increments.

## Group Insurance Benefits

*Existing collective bargaining agreement:* Collectively-bargained terms for Group Insurance Premiums by which the County contributed 80% of the insurance premiums for a Point-of-Service (POS) medical plan, a Stand-alone prescription drug plan (Standard Option plan), a Dental Plan, a Vision Plan, Basic Life insurance, Dependent Life insurance $2,000/$1,000/$100 tier, and Long-term disability insurance with the remaining 20% of the premium paid by the affected police officers.

*Resolution No. 17-149:* The terms of the collectively-bargained health benefits for the affected Montgomery County police officers *were changed* by reducing the County's contribution for Group Insurance Premiums for a Point-of-Service (POS) medical plan, a Stand-alone prescription drug plan (Standard Option plan), a Dental plan, a Vision plan, Basic Life insurance, Dependent Life insurance $2,000/$1,000/$100 tier, and Long-term disability insurance to 75% of the insurance premiums, and increasing the amount of the contributions to be paid by the affected police officers to 25%.

## Prescription Drug Benefits

*Existing collective bargaining agreement:* Collectively-bargained terms for Prescription Drug Benefits by which the affected police officers and their dependents were able to purchase brand name prescription drugs and unrestricted dosages of certain other drugs.

*Resolution No. 17-149:* The terms of the collectively-bargained Prescription Drug Benefits *were changed* to require affected police officers to receive generic prescription drugs, if available, instead of brand name drugs and limiting the dosage of certain drugs available to the affected police officers.

## Retirement Benefits

*Existing collective bargaining agreement:* Collectively bargained [sic] terms for Retirement Benefits for the affected police officers by which each officer contributes a set percentage of regular earnings to his/her retirement and the County contributes an additional amount depending on actuarial assumptions and analysis to fund the officer's retirement benefit. In addition, the Retirement Benefits include an annual cost of living adjustment ("COLA") for inflation which is 100% of the Consumer Price Index ("CPI") up to 3% plus 60% of the CPI over 3%.

*Resolution No. 17-149:* The terms of Retirement Benefits for the affected police officers *were changed* in that the amount of each officer's contribution to his/her pension benefit was increased by 1.0% for FY12 and

9

2.0%, total, for FY13.  Additionally, the annual COLA *was changed* to be no more than 2.5% of the CPI.  The net effect of these changes was a reduction in the County's contribution to each officer's retirement benefit.

(Emphases added in the original.)

On 24 June 2011, the FOP filed suit against the County and the Council in the Circuit Court for Montgomery County challenging the legality of the Council's actions in adopting Resolution No. 17-149 and the actions of the Council and the County in implementing the changes in the Resolution.  The Amended Complaint, filed on 3 October 2011, contained six counts seeking/asserting: (1) a declaratory judgment that the County is obligated to comply with the CBA, that the Council's adopting Resolution No. 17-149 violated the rights of the affected police officers and the PLRA, and that the County's and Council's implementation of the Resolution violated the rights of the police officers; (2) an injunction directing the County to comply with the CBA and enjoining the implementation of the Resolution as to the changes in employment benefits; (3) breach of contract for altering the employment benefits in the CBA; (4) mandamus for judicial review of the Council's decision in Resolution No. 17-149; (5) violation of the PLRA in adopting the Resolution; and (6) violation of State constitutional rights, "including, *inter alia*, Articles 19 and 24 of the Maryland Declaration of Rights," in adopting the Resolution.  The County and the Council filed, collectively, a Motion to Dismiss or, in the alternative, Summary Judgment.  In response, the FOP filed a motion opposing the defendants' Motion to Dismiss or, Alternatively, Summary Judgment, as well as a Cross-Motion for Summary Judgment.

10

On 1 March 2012, the Circuit Court issued a memorandum opinion and declaratory judgment, declaring that the Council's actions were permissible under the PLRA, the Maryland Declaration of Rights, and the existing collectively-bargained agreement. The FOP filed a motion to reconsider, which the Circuit Court denied. The FOP appealed to the Court of Special Appeals, which affirmed the decision of the trial court in *Fraternal Order of Police, Montgomery County Lodge 35 v. Montgomery County, Maryland*, 212 Md. App. 230, 66 A.3d 1183 (2013).

We granted the FOP's Petition for Certiorari to consider the following question: "May the County Council unilaterally change the terms of a pre-existing negotiated collective bargaining agreement?" 432 Md. 466, 69 A.3d 474 (2013). The County frames the question(s) presented a bit differently:

(1) Did the County Council properly exercise its discretion under the police collective bargaining law when it decided, in the FY 12 Annual Operating Budgeting Resolution, not to fully fund the employment benefits described in the police collective bargaining agreement for FY 12?

(2) Did Petitioners state a claim under Articles 19 or 24 of the Maryland Declaration of Rights?

## III.   STANDARD OF REVIEW

"Deciding an appeal is not a matter of approaching the problem as if for the first time. It is determining whether another, earlier, carefully structured decision should be upheld." Frank M. Coffin, *The Ways of a Judge: Reflections from the Federal Appellate Bench* 52 (Houghton Mifflin 1980); *see also id.* at 53-54 (characterizing this limitation as a "source of strength" because the "raw materials for appellate deliberation are already fixed, assembled, and focused"). The appellate court is not an advocate tasked with

11

searching for each party's winning argument. Rather, the appellate court is limited ordinarily to the arguments raised by the parties and the issues decided by the lower courts.

This case, as laid before us, is seen through the small window that the parties have opened for our view. The basis of the Petitioner's lawsuit is that the Council violated the PLRA by "changing" improperly the terms of collectively-bargained employee benefits in the course of carrying out its budgetary approval function. The County and the Council argue that the Council's actions were proper because the Council has the ultimate authority to choose to fund or to refuse to fund the benefits provided in the CBA. The FOP agrees that the Council has the ultimate budgetary approval function and that the Council has the authority to refuse to appropriate funds for parts of the CBA, but argues that the Council does not have the authority under the PLRA to change the terms of the benefits.

As an appellate court, we are circumscribed ordinarily by the stipulated facts and arguments. As such, certain areas of inquiry or comment are "off-limits" (even though our addressing them may have provided a more lucid picture of the situation and the applicable laws). *See, e.g.*, *supra* note 6. In determining the question of whether the Council violated the PLRA when it adopted Resolution No. 17-149, we are tasked with construing the relevant law, the PLRA. "We construe local ordinances and charters under the same canons of statutory construction as we apply to statutes," *120 W. Fayette v. Baltimore*, 413 Md. 309, 331, 992 A.2d 459, 472 (2010), and we review the Circuit Court's decisions without deference to determine whether the conclusions involving

12

ordinance construction were correct legally. *See, e.g.*, *Atkinson v. Anne Arundel Cnty.*, 428 Md. 723, 741, 53 A.3d 1184, 1195 (2012).

## IV.  ANALYSIS.

The PLRA permits the Council to refuse to fund the CBA.  MCC § 33-80(h).  At issue here is (1) whether the Council has the authority under the PLRA to define and change the terms of the CBA, and (2) whether the Council terminated "unilaterally" the negotiations in violation of the PLRA.  We hold, as to the first question, that the Council has such authority, at least when the changes are fiscal in nature and the parties are unable to reach a re-negotiated agreement, in accordance to the fiscal demands of the Council.   Secondly,  we  hold  that  the  Council  did  not  terminate  improperly  any re-negotiations.

### 1. The Council has the authority to define and change terms of the CBA, at least in these circumstances.

The Circuit Court concluded, and the Court of Special Appeals agreed, that the Council may change the terms of the CBA as part of its budgetary approval function, pursuant to MCC § 33-80(i).[8]  Those courts interpreted subsection (i) as providing that, whenever the Council does not take action necessary to implement or fund a provision in the CBA, that provision is reduced or eliminated automatically.  The FOP disagrees, arguing that this subsection "does not provide for an automatic reduction or elimination

---

[8] Subsection (i) provides, in pertinent part, that "any agreement shall provide either for automatic reduction or elimination of conditional wage or benefit adjustments if . . .  sufficient funds are not appropriated for any fiscal year when the agreement is in effect."  MCC § 33-80(i).

of conditional benefits. Rather, that section provides that the CBA must provide for such a reduction."

We agree with the FOP that the subsection does not reduce or eliminate automatically the conditional benefits, but rather requires that the CBA provide for such a reduction. We note further that MCC §§ 33-80(i) and (j) are inapplicable in this case because the relevant provisions are not "**conditional** wage or benefit **adjustments**." Subsections (i) and (j) apply to provisions in multi-year agreements that are set to adjust "after the first year of any multi-year agreement." The relevant provisions at issue here were set to continue automatically into the second year of the multi-year agreement. Thus, we are left with determining how the Council should proceed when, after determining that it will not appropriate fully funds for the CBA, the parties do not submit a re-negotiated agreement.[9]

The FOP asserts that "the 'how' of any automatic or involuntary reduction or elimination must be achieved through collective bargaining with binding arbitration." Thus, according to the FOP, there is a difference between refusing to fund a benefit,

---

[9] The PLRA envisions that the Council will decide to appropriate funds (or not) for the collectively-bargained agreements each fiscal year. As MCC § 33-80(g) provides: "**In each proposed annual operating budget**, the County Executive shall describe any collective bargaining agreement or amendment to an agreement that is scheduled to take effect in the next fiscal year and estimate the cost of implementing that agreement." (Emphasis added.) Thus, that the refusal to fund all of the benefits applied to previously agreed-upon terms in the pre-existing CBA does not change the analysis. Because the Council is not bound by the CBA, as the County Executive is bound, and because the Council's authority lies in its budgetary powers, which arise every fiscal year, it follows that the Council has the authority, every year, to choose to fund or to refuse to fund the CBA in full or in part.

14

which the Council is permitted to do, and defining (or re-defining) the terms of the agreement, which the Council is not permitted to do. In response, the County and the Council characterizes the FOP's argument as "sophistry" and the perceived difference between funding a benefit and establishing the terms of the benefit as "metaphysical."

In determining the outcome, we find subsection (h) most instructive. According to MCC § 33-80(h), the Council designates representatives "to meet with the parties [the County Executive and the FOP] and present the Council's views" in the parties' **attempts** to re-negotiate a CBA acceptable to the Council. Subsection (h) does not require the parties to reach an agreement that is acceptable to the Council, but rather requires that the parties—again, the County Executive and the representative of the FOP—**attempt** to re-negotiate an acceptable agreement. The Council—which is the sole actor being challenged in this lawsuit—is required only to designate a representative to meet with the parties to convey the Council's views in their further negotiations. In other words, under the PLRA, the Council's representative has a very limited role: to facilitate the re-negotiation process. The Council's representative is not a "party" to the re-negotiations and, thus, is not responsible for the progress, success, or failure of the re-negotiations.

Although the FOP agrees that the Council is not a party to the negotiations, the FOP avers that the Council may *never* determine any of the terms to the CBA. We disagree. The PLRA provides the negotiating parties with nine days to attempt to re-negotiate an agreement acceptable to the Council. MCC § 33-80(h). The PLRA states that either party may initiate the impasse procedures. *Id.* Such language—"**attempt** to

15

re-negotiate" and "either party **may initiate**"—suggests that the PLRA envisioned scenarios in which the parties may not reach an agreement to propose to the Council.

The FOP and the County Executive, as the parties responsible for negotiating a new agreement acceptable to the Council, were given the opportunity to set forth the "how," but were unable to reach an agreement and chose not to proceed with the impasse procedures. That the parties did not reach such an agreement and did not initiate the impasse procedure left the Council with the responsibility to determine how the funding cuts would be made. By the very nature of the Council's budgetary approval function, if the parties do not set forth an acceptable agreement, then the Council must have the authority to finalize the budgetary process and determine which provisions in the CBA should be cut, and in what manner, in order to reach set budgetary goals. In this case, no agreement was reached; none was proposed to the Council; and, thus, the Council acted correctly in making the cuts where deemed necessary.

### 2. The Council did not terminate "unilaterally" negotiations.

The FOP maintains that, even if the PLRA is interpreted as we have above, the negotiating parties were not at fault in failing to produce a re-negotiated agreement acceptable to the Council in this case, but rather the Council was at fault in frustrating the re-negotiations from taking place over their maximum term. According to the FOP, the 16 May 2011 e-mail from the Council to FOP President Marc Zifcak "unilaterally terminat[ed]" prematurely the re-negotiations between the County Executive and the FOP, two days short of the nine-day period allowed by the PLRA for re-bargaining. In response, the County and Council argue that the FOP waived this argument when it failed

16

to raise it before the Circuit Court prior to the FOP's post-judgment Motion for Reconsideration.[10]

Assuming, *arguendo*, that the e-mail is properly before us for consideration,[11] the e-mail, standing alone as it does in the record, is insufficient from which to determine that the Council ended "unilaterally" and prematurely negotiations. The author of the e-mail states that the Council's statement was in response to an earlier e-mail from Zifcak. The record does not contain a copy of the earlier e-mail. Thus, we do not have any point of reference to place in context the Council's statements. Moreover, the record does not inform us what happened after the e-mail was sent. For example, the record provides no indication whether the FOP attempted to continue negotiations with the County Executive. Perhaps had the Council rejected such an attempt by the FOP, we

---

[10] As the County points out correctly, the Complaint "contains no allegation that the Council prematurely terminated or refused to participate in negotiations during the nine-day period for re-bargaining under the PLRA." The 16 May 2011 e-mail appeared for the first time in the Circuit Court record when the FOP attached it to Zifcak's second affidavit as part of their Motion for Reconsideration. In Zifcak's second affidavit, he referred to the e-mail in ¶ 5 as follows:

> Until its action in adopting Resolution No. 17-149 on May 26, 2010, when the County Council expressed an intent that it would not fully fund a collective bargaining agreement the County Executive and FOP 35 entered into negotiation to modify or change terms or conditions of the collective bargaining agreement to be acceptable to the County Council pursuant to the [sic] § 33-80(h), PLRA, procedure. However, in May 2011, the Council refused to follow the statutory procedure mandated by § 33-80(h), PLRA. *See*, Attachment 6.

[11] Resolving the preservation challenge is unnecessary because we conclude that, assuming the FOP's argument was preserved, the e-mail is insufficient evidence that the Council terminated "unilaterally" the re-negotiations, in violation of the PLRA.

17

might view the case differently. What the record does tell us is that the impasse procedure was not initiated by either party; the Council did not determine its next steps for the FY 12 budget for the CBA until the May 18 deadline; and, the Council did not vote to adopt the operating budget for FY 12 until 27 May 2011, nine days after the May 18 deadline.

Moreover, because the Council's only role in the re-negotiations is to designate a representative to meet with the parties and to present the Council's views in the further negotiations, the e-mail could be interpreted as the Council informing the parties that it had presented its views and that, unless the parties inform the Council of an alternative proposal, the Council plans on voting for the budget, as indicated in the earlier resolution, promptly after the May 18 deadline. Although the e-mail does not state this explicitly, without other evidence regarding the apparent exchange of communications, this circumstance cannot be ruled out. As such, the Council's actions hardly can be viewed as "unilateral." The PLRA provides avenues through which the FOP and County Executive can (and are encouraged to) determine the employee benefits through a series of negotiations. We cannot fault the Council, however, where the FOP and the County Executive fail to do their part. Thus, we hold that, as the record stands before us, the Council did not "unilaterally terminate" the re-negotiations in violation of the PLRA.[12]

---

[12] Because the FOP's due process arguments depend upon us acquiescing in its interpretation of the PLRA, we do not reach the second question regarding the petitioner's rights under the Maryland Declaration of Rights.

18

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**