*Atkinson v. Anne Arundel Cty.*, No. 788, Sept. Term 2016
Opinion by Leahy, J.

**Local Governments > Charter Counties > Charter Provisions > Tenets of Interpretation**
To the extent a later-enacted charter provision is more specific than a previously-enacted, general provision, and can be said to alter the overarching scheme as it existed prior to its enactment, we "should give effect to the specific statute in its entirety and should retain as much of the general statute as is reasonably possible." *State v. Ghajari*, 346 Md. 101, 116 (1997) (citation omitted).

**Local Governments > Charter Counties > Charter Provisions > Tenets of Interpretation > Justiciability**
Whether health insurance benefits are subject to the mandated bargaining and arbitration process under the Anne Arundel County Charter is a justiciable issue, and that the circuit court erred when it decided that it was the County Council's legislative function, exclusively, to resolve any ambiguities in the phrase "term and condition of employment" contained in Charter § 812.

**Local Governments > Charter Counties > Charter Provisions >**
It is unnatural and would ignore logic to read Anne Arundel County Charter § 812 to require arbitration over terms and conditions of employment during the second step of labor negotiations if those terms and conditions of employment were not subject to collective bargaining during the first step of the process. The more natural reading of Charter §§ 811 and 812 is that terms and conditions of employment are subject to a two-step process of collective bargaining and arbitration.

**Local Governments > Charter Counties > Charter Provisions > Tenets of Interpretation > Terms of Art**
"Terms and conditions of employment," as employed in the Anne Arundel County Charter, is a term of art that includes healthcare insurance benefits.

**Local Governments > Charter Counties > Charter Provisions > Legislative Authority**
Interpreting a charter's use of the phrase "terms and conditions of employment" to include health insurance benefits does not strip the county council of its legislative discretion to enact a comprehensive scheme for collective bargaining and arbitration over health insurance benefits.

**Local Governments > Charter Counties > Charter Provisions > Legislative Authority**
In determining whether a charter provision is impermissibly legislative, we recognize, as the Court of Appeals did in *Save Our Streets*, that the length and detail of the charter provision is not dispositive and focus instead on "the degree to which the county council retains discretion and control regarding an area under its authority pursuant to Article XI-

A of the Maryland Constitution." *Save Our Streets v. Mitchell*, 357 Md. 237, 253 (2000).

**Local Governments > Charter Counties > Charter Provisions > Legislative Authority**
When a county charter provides that the county must submit employee health insurance benefits to collective bargaining and binding arbitration, the county council may not pass legislation that limits "bargaining" rights to a *de minimis* level.

Circuit Court for Anne Arundel County
Case No. C-02-CV-15-000539

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 788

September Term, 2016

O'BRIEN ATKINSON, IV, *et al.*

v.

ANNE ARUNDEL COUNTY

Nazarian,
Leahy,
Beachley,

JJ.

Opinion by Leahy, J.

Filed:  March 28, 2018

This is the second case in recent years in which public safety employees in Anne Arundel County have challenged the County Council's legislative restriction on collective bargaining. *See Atkinson v. Anne Arundel Cty.*, 428 Md. 723 (2012) [hereinafter "*Atkinson I*"]. The Charter for Anne Arundel County ("Charter") grants public safety employees the right to bargain collectively and submit to binding arbitration any resulting labor disputes concerning the "terms and conditions of employment." In 2014, the Anne Arundel County Council ("County Council" or "Council") adopted Bill 85-13. Certain provisions of the Bill, enacted as § 6-1-308(b)(2)-(4) and (i)(4)-(6) of the Anne Arundel County Code ("Code"),[1] exclude employee health insurance benefit options and health insurance plans from collective bargaining and arbitration.

After the County Administrator, relying on the new law, declined to negotiate employee health insurance benefit options and plans, aggrieved members of the public safety unions affected by Bill No. 85-13 ("Appellants")[2] filed a declaratory judgment action in the Circuit Court for Anne Arundel County against Anne Arundel County ("County" or "Appellee"). Appellants alleged that the County Council exceeded its

---

[1] Unless otherwise specified herein, all references to Bill 85-13 in this opinion refer to these provisions of the Bill.

[2] Appellants include some of the same employees and employee unions as in *Atkinson I*. Appellants are organizations that represent Anne Arundel County's uniformed firefighters and law enforcement officers, four members of those organizations, and a spouse of one of the members. Appellants include: O'Brien Atkinson IV; David Belisle III; Patricia Belisle; the Fraternal Order of Police, Lodge 70; John McDonough, Adam Palinkas; Anne Arundel County Professional Fire Fighters, IAFF Local 1563; and Truck Drivers, Helpers, Taxicab Drivers, Garage Employees and Airport Employees Local 355 affiliated with the International Brotherhood of Teamsters, Anne Arundel County Police Supervisors' Association, and International Brotherhood of Police Officers, Local 799

legislative authority in enacting Bill 85-13. The County filed a counterclaim for declaratory judgment, asserting that the County Council's passage of Bill 85-13 was a lawful exercise of its legislative powers. The parties filed cross-motions for summary judgment. After a hearing, the circuit court denied Appellants' motion and granted summary judgment in favor of the County. Appellants noted a timely appeal to this Court on June 24, 2016, and shortly after, petitioned for certiorari in the Court of Appeals. By order dated September 29, 2016, the Court of Appeals denied Appellants' petition and the County's conditional cross-petition.

Appellants ask us to consider whether laws enacted pursuant to Bill 85-13 that prohibit collective bargaining and arbitration over employee health insurance benefit options and plans violate the form and structure of the County's annual budget and appropriation process established under Charter Article VIII, §§ 811 and 812.[3] Appellants also ask whether the circuit court erred when, rather than apply the plain meaning of the phrase "terms and conditions of employment" contained in Charter § 812, it deferred to the County Council to define the scope of the law.

---

[3] Appellants present two questions for our review:

1. "Do the terms of Anne Arundel County Bill 85-13 that prohibit collective bargaining and arbitration over employee health insurance benefit options, over health insurance plans, and over the County's subsidy of health benefit costs, violate the form and structure of the County's annual budget and appropriation process established by County Charter §§ 811 and 812?"

2. "Did the Circuit Court err by deferring to the County Council and failing to exercise its responsibility to find and apply the plain meaning of the phrase 'terms and conditions of employment' in Charter § 812?"

2

According to the County, Charter § 812 does not actually require that it bargain over any terms and conditions of employment. Moreover, the County argues that Appellants' reading of Charter §§ 811 and 812 as limiting the County's authority to define the scope of terms and conditions of employment "would lead to an unconstitutional result" under Article XI-A, § 3 of the Maryland Constitution because it would impermissibly limit the County Council's legislative authority.

We hold that under Charter §§ 811 and 812, the terms and conditions of employment are subject to the two-step process of collective bargaining and arbitration. We also hold that the circuit court erred when it decided that it was the County Council's legislative function, exclusively, to resolve any ambiguities in the phrase "terms and conditions of employment" contained in Charter § 812. We conclude that "terms and conditions of employment," as employed in Charter § 812, is a term of art that includes healthcare insurance benefits. We hold, therefore, that the provisions of Bill 85-13 that effectively render meaningless Appellants' right to bargain collectively over the cost of their healthcare insurance benefits are invalid under Charter §§ 811 and 812. However, because this appeal is from the erroneous grant of summary judgment, the record is not developed sufficiently to define the scope of collective bargaining rights intended under Charter §§ 811 and 812. Accordingly, we remand the case for further proceedings.

## BACKGROUND

### A. The Run Down: Collective Bargaining in the County

The citizens of Anne Arundel County amended their Charter during the 1988 election to provide for collective bargaining between the County and certain county

employees' union representatives. Section 811 of the Charter mandates that "[e]mployees in the classified service shall have the right to organize and bargain collectively through representative employee organizations of their own choosing as provided by ordinance of the County Council." Consistent with Charter § 811, County Code § 6-4-108(a) provides that "[a]n exclusive representative may negotiate collectively with the Administration in matters related to wages, hours, working conditions, and other terms of employment of employees[.]"

In 2002, at the recommendation of the Charter Revision Commission, the County Council proposed a resolution to provide for binding arbitration to resolve disputes over police, fire, and other public safety contracts that may arise during labor negotiations pursuant to Charter § 811. *Atkinson I*, 428 Md. at 734-35. Voters adopted the 2002 amendment, enacting Charter § 812, which states:

> (a)  In addition to the right granted to County employees in Section 811 of this Article to organize and bargain collectively, the County Council shall provide by ordinance for binding arbitration with authorized representatives of the appropriate employee bargaining unit in order to resolve labor disputes with the County's law enforcement employees. The ordinance shall provide for the appointment of a neutral arbitrator by the parties to the arbitration who shall issue a binding decision to be implemented as part of the following year's budget process and which shall take into account the financial condition of the County and the reasonable interests of the law enforcement employees and the county relating to the terms and conditions of employment. . . .[4]

---

[4] Subsection (b) provides the same rights to "uniformed firefighters of the Fire Department."

4

The following year, the County Council adopted Bill 1-03, codified at County Code § 6-4-111, to implement § 812 of the Charter. The Court of Appeals explained the effect of Bill 1-03 in *Atkinson I*:

> Under Bill 1-03, if an impasse exists on March 15 of any fiscal year, the parties may agree to a non-binding confidential mediation but must commence arranging for binding arbitration as well. Provision is made for selecting an arbitrator and an alternative arbitrator. The powers and duties of the neutral arbitrator are set forth, time limits are established, and a "baseball" type of award is to be rendered.[][5] Subsection (m) provides, in relevant part, as follows:
>> "The final written award issued by the neutral arbitrator . . . and the memorandum of agreed issues shall be final and binding upon the County and the Uniformed Public Safety Exclusive Representative and shall be implemented as part of the budget process for the appropriate fiscal years."
>
> Either party may move to vacate the award by an action in the Circuit Court for Anne Arundel County.

428 Md. at 736.

Then, in 2011, the County Council enacted Bill 4-11 to amend § 6-4-111 by removing language requiring that the arbitrator's decision "shall be implemented as part of the budget process for the appropriate fiscal years." The bill also provided that the County Council "shall not be required to appropriate funds or enact legislation necessary to implement a final written award." *Id.* at 739. In effect, Bill 4-11 created a system by

---

[5] Thomson Reuters' Practical Law Glossary, Item 0-523-1627 (2018), defines "baseball arbitration" as follows:

> An arbitration where each party submits a proposed settlement amount and, after a full hearing before an arbitrator or panel of arbitrators, the arbitrator or panel selects one of the proposed settlements as the final award. Baseball arbitration is a type of binding mediation, but unlike other types of arbitration, the arbitrator selects one of the parties' proposed settlements instead of calculating the award in another way.

5

which, if the arbitrator chose the employees' final offer, the County Council could then choose whether or not to fund the final award. *Id.* at 742.

In *Atkinson I*, public safety employees challenged several features of the legislative enactment embodied in Bill 4-11, arguing that it offended § 812 of the Charter. *Id.* at 741. The County, on the other hand, contended that "Bill 4-11 simply construed Charter § 812 to retain the Council's power [under Charter § 709] to reduce or delete appropriations and that that construction [wa]s necessary to avoid rendering Charter § 812 unconstitutional." *Id.* at 742.

The Court of Appeals addressed the constitutionality of Charter § 812 and observed that its provisions qualified as charter material.[6] The Court reasoned that "[w]hether some portion of the County Council's role in the budget process is to be transferred to a neutral arbitrator, in the event of an impasse in collective bargaining with public safety employees, affects the form and structure of government." *Id.* at 748. The Court held that "Charter § 812 did not unconstitutionally preclude the exercise of the County Council's law-making discretion[]" because the voters had made a policy decision and "left all of the detail of implementation to the Council for the exercise of its Art. XI-A, § 3 law-making power[.]" *Id.* at 749-50. As for the particular provisions of Bill 4-11, the Court held that § 2, which permitted the County Council to modify or abrogate a binding award, ran afoul of Charter § 812's requirement that the final award "be binding on the County, which includes the

---

[6] "Charter material," as we explain in section I.B.4 below, is shorthand for a provision that affects the structure and form of government and may be added to a municipality's governing charter without infringing on the local legislature's authority.

County Council." *Id.* at 743-44.  The Court also struck down § 3 of Bill 4-11, which attempted to repeal all of Section 6-4-111 in the event that the Court found § 2 invalid, as violative of Charter § 812.  *Id.* at 752-55.

### B.  On Deck: Bill 85-13

In September 2011, as litigation was ongoing in *Atkinson I*, the County created a Collaborative Study Group ("Study Group") to address the increasing costs of employee benefits, concerns about the continued funding of retiree healthcare benefits and pensions, as well as uncertainty surrounding healthcare generally following the passage of the Patient Protection and Affordable Care Act.  The Council charged the group, in part, with "determin[ing] fair and equitable priorities in the reduction of the benefit costs, ensuring that such benefits are fair to employees, retirees, and taxpayers of Anne Arundel County and can be funded on a fiscally sustainable basis[.]"  The Study Group issued its final report on February 14, 2012.  Its analysis focused heavily on the costs to the County of providing healthcare benefits to employees and retirees and recommended several alternatives, including "establish[ing] a trust to insulate health benefit prefunded assets."  After receiving the Study Group's report and recommendations, the County Council proposed two new Charter Amendments, both passed by the voters later in 2012: Charter § 718, which required the County to create a reserve fund for retirees' healthcare benefits, and Charter § 815,[7] which granted the Council authority to establish the reserve fund by

---

[7]  Charter § 815, as adopted in 2012, provides:

**Section 815.  Retiree Health Benefits Trust**

ordinance.

The next year, on October 7, 2013, the Council introduced Bill 85-13, the passage of which gave rise to the underlying lawsuit. Ms. Amy Burdick, the County's Acting Personnel Officer, spoke at the public hearing in support of the bill. She stated that the County's position has been "that they will negotiate with the unions only over the cost share for the various health plans[,]" and that the County "do[es] not and will not negotiate over things such as deductible or other types of plan design issues."[8] If the unions had a problem with a plan design, Ms. Burdick explained that the County "would meet with them and explain [its] position and listen to [the unions'] concerns and incorporate changes if it was appropriate[,]" but that there was no legal recourse for the unions if the County did not want to incorporate their changes. Mr. David Plymyer, the County Attorney, told the

---

The County Council may by ordinance establish the Reserve Fund for retiree health benefits described in Section 718(i) of this Charter as an "other post-employment benefits" (OPEB) trust known as the Retiree Health Benefits Trust, and provide for the number and manner of appointment of the trustees and the exercise of the powers and duties of the trustees as an independent agency of the County without regard to the limitations otherwise imposed under Articles IV and IX of this Charter.

[8] This is consistent with an affidavit that Ms. Andrea M. Rhodes, the County Personnel Officer, filed with the circuit court in the underlying action. In the affidavit, Ms. Rhodes states

On the issue of health care benefits, the County Administration has engaged in collective bargaining with [Appellants] only with respect to the cost share allocation, or employer subsidy, for each available plan option. The County Administration has never bargained with any union, including [Appellants], over issues of health plan design, such as health plan options, providers, deductibles or co-pays.

8

Council that if the unions were dissatisfied with things like "co-pays, deductibles, or out-of-pocket costs," then "the employer would have the right to have an arbitrator ultimately decide." He stated, however, that he believed Bill 85-13 "perfectly embodies past practice and clarifies that the County does not negotiate post-employment, such as retiree benefits." Testifying to the contrary, Mr. Joel Smith, a labor and employment law attorney, said that he was surprised that the County's answers at the hearing "did not include any reference to contracts and the elements of contracts that are routinely entered into between the County and its bargaining representatives."[9] He stated that "healthcare, wages, and pensions" are the three cardinal rules of bargaining.

The Council passed Bill 85-13 on January 6, 2014, and it took effect on March 1, 2014. The new law established a more comprehensive County public safety employee and retiree health benefits program by repealing and replacing § 6-1-308 of the Code.[10] The

---

[9] At oral argument before this Court, Mr. Smith, as attorney for Appellants, reiterated that the parties' past labor negotiations had included healthcare provisions such as "copays, maximums, deductibles, what's covered and what's not and to the extent that it's covered, and things like prescriptions formularies."

[10] The previous version of § 6-1-308 of the Code, entitled group health insurance, provided in its entirety:

> (a)    **Generally.** The County shall provide a group health plan for employees who are members of the group health plan; employees permanently and totally disabled from performing an occupation who have been retired from County Service as a consequence of the disability; and, in accordance with criteria established by the Personnel Officer, employees who retire from County service.
> (b)    **Cost.** The cost of each employee's benefits under the group health plan shall be shared by the County and the employee:
> (1)    for employees represented by an exclusive representative, as

9

law also added a new provision to Article 4, Title 11 that requires the County Executive to submit a five-year plan to the County Council to fund the retiree health benefits reserve fund. § 4-11-117.

Additionally, Bill 85-13 imposed new limitations on public safety employees' collective bargaining rights. The amendment to § 6-1-308(b)(1) established that "[t]here is a County Employee and Retiree Health Benefits Program administered by the Personnel Officer that shall include insurance for medical care and prescription drugs and may include insurance for dental and vision care as provided in this section."[11] Through Bill 85-13, the County Council granted to the County's Personnel Officer the duty and authority "to establish the health insurance benefit options and design the health insurance plans

_____

provided in a memorandum of agreement negotiated and signed under Title 4 between the County and the exclusive representative;

(2)  for employees who are not represented by an exclusive representative, as determined by the Personnel Officer;

(3)  for employees who retire from County service, the County shall pay 80% of the cost and the employee shall pay 20% of the cost; and

(4)  for part-time employees who work at least 50% of the normal work week, the County shall pay a prorated portion of the cost paid for full-time employees.

(c)  **Health care accounts.**  The County may establish health care accounts approved by the Internal Revenue Service to permit the accumulation of monies to pay for the health care expenses of employees and retirees.

[11] Persons eligible to participate in the program include certain full-time classified employees and other enumerated employees who work full-time or at least 50% of the workweek, the surviving spouses and unmarried children of employees who die while employed, certain retired employees and Medicare participants, and certain dependents of employees or retirees. § 6-1-308(d)-(g).

10

made available to participants[.]" § 6-1-308(n)(1).  Collective bargaining is delimited in § 6-1-308(b)(3):

> The health insurance benefit options, health insurance plans, and employer subsidies for retirees and survivors are not subject to collective bargaining. Employer subsidies for employees are subject to collective bargaining in accordance with subsection (i)(5).  The health insurance benefit options and health insurance plans offered to employees are not subject to collective bargaining.  However, before beginning collective bargaining over employer subsidies in accordance with subsection (i)(5) the Personnel Officer shall consult with and consider the comments by exclusive representatives on the health insurance benefit options and health insurance plan or plans that the Personnel Officer proposes to offer to employees.

Accordingly, the employer subsidy is the only aspect of the healthcare program subject to collective bargaining under the new law.  *See* § 6-1-308(b)(4).  Section 6-1-308(i)(5) provides that "[t]he employer subsidy used to determine the rates for employees represented by an exclusive representative selected in accordance with Title 4 and any monetary credits for opting out of coverages shall be determined through collective bargaining and, if applicable, binding arbitration."  Pursuant to § 6-1-308(k)(2), however, "[t]he amount of the subsidy or allowance shall be proposed by the Personnel Officer and approved by resolution of the County Council."  For current employees, § 6-1-308(i)(4) specifies:

> Effective January 1, 2016, employer subsidies for optional plans available to participants for the same type of coverages established in accordance with this subsection shall be applied to the estimated annual costs for the plan with the lowest estimated annual costs approved by resolution of the County Council under subsection (h) in order to determine the rates paid by participants in health insurance plans.  Participants who select plans other than the plan with the lowest estimated annual costs shall pay all costs for the plans in excess of the amount of the employer subsidy as applied to the plan with the lowest estimated annual cost.

11

In other words, Subsection (i)(4) sets a flat-rate employer subsidy based on the amount the employer contributes to the lowest-cost plan option and requires employees who choose a more expensive plan to cover all additional costs in excess of that flat-rate subsidy. For instance, if the lowest-cost plan is $100 per month and the County agrees to pay 85% of the cost of the lowest-cost plan, the County's contribution will remain $85 per month regardless of whether an employee chooses the lowest-cost plan or a more expensive plan. The flat rate established under Subsection (i) is also the rate of Medicare subsidy, cash subsidy, or allowance available to retirees under Subsections (j) and (k).

The County and union representatives began collective bargaining sessions in January 2015 in advance of the County's fiscal year 2016 budget and the expiration of the two-year Memorandum of Agreement between the County and public safety employee unions. These negotiations took place following passage of Bill 85-13 and, according to Appellants, in at least two of those sessions, "the County Administrator announced that it intend[ed] to rely on Bill 85-13, codified as Code § 6-1-308, to refuse to bargain over essential 'terms and conditions of employment' with respect to employee health insurance plans."

### C. The Challenge

On February 13, 2015, Appellants filed a complaint in the circuit court for declaratory and injunctive relief under the Maryland Uniform Declaratory Judgments Act, Maryland Code (1973, 2013 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"), § 3-401 *et seq.*, seeking a judgment declaring that Bill 85-13 and § 6-1-308 of the Code are

contrary to Charter § 812.  Appellants also sought to enjoin the County from enforcing the new law.

Appellants challenged the provisions of § 6-1-308 exempting health insurance options and plans offered to employees and retirees from collective bargaining.  According to Appellants, prior to the enactment of this bill, health insurance benefit options and plans were subject to collective bargaining between the County and Appellants.  Appellants asserted that "Bill 85-13 will interfere with and impair [their] enjoyment of the rights secured and guaranteed to them under County Charter VIII, §§ 811 and 812," which is prohibited by the Court of Appeals' holding in *Atkinson I*, 428 Md. 723.  They complained that during negotiations, the County Administrator proposed, in writing, an employer subsidy of 85% of the health insurance premium for the plan with the lowest estimated annual cost to the Fraternal Order of the Police ("FOP 70") for police department employees, IAFF 1563, and other public safety employee unions.  Appellants aver that, at that point, the Personnel Officer had not selected which health insurance plans would be available for the 2016 Calendar Year.  Because the dollar value of the employer subsidy depends on the insurance premium of the plan with the lowest estimated annual cost, Appellants believed that their right to bargain was "meaningless."  The County disagreed and asserted, as they maintain on appeal, that collective bargaining need extend only to the cost allocation of the health insurance benefits between the County and employees.

### D.  Stay Delay

Appellants filed a motion for summary judgment on February 25, 2015, asserting that Bill 85-13 conflicts with Charter §§ 811 and 812.  They contended that Bill 85-13

limited public safety employees' collective-bargaining rights by "prohibit[ing] negotiation over health insurance benefit options;" "confin[ing] County support for its health insurance plans to the employer subsidy;" and "restrict[ing] collective bargaining and binding arbitration to the amount of the employer subsidy of undetermined plans and any credits for opting out of coverage." Further, Appellants asserted that any right to bargain over the employer subsidy under the new law "is meaningless" because the subsidy is tied to the lowest-cost health insurance plan, which the County Administrator chooses. Appellants maintained that neither Charter § 811 nor § 812 exempt health insurance plans, benefit options, and employer subsidies from collective bargaining. According to Appellants, "terms and conditions of employment" in Charter § 812 is a term of art that includes health insurance benefits, which are "bedrock elements of employee compensation."

Appellants then filed a motion for a temporary restraining order and preliminary injunction on March 9, 2015. On March 13, 2015, the circuit court granted Appellants' motion and issued a preliminary injunction. The court ordered the County to

> retain in place the existing health insurance plans, health insurance benefit options, and cost allocations (including premium share and co-pay formulae) without change through December 31, 2015. The Defendant County shall use its best efforts to maintain similar health insurance plan options (i.e. HMO, non-HMO) for the plan year commencing January 1, 2016 and the premium share cost allocation currently being paid by County employees represented by the union Plaintiffs shall remain the same for similar plans[.]

Additionally, the court enjoined the County from enforcing §§ 6-1-308(b)(2)-(4) and 6-1-308(i)(4)-(6) of the Code. This preliminary injunction remains in effect until the court orders otherwise.

14

**E. The Shutout**

On March 30, 2015, the County filed its answer and a counterclaim for declaratory judgment. In its counterclaim, the County asserted that Bill 85-13 was valid because the former version of § 6-1-308 limited collective bargaining on health benefits to the cost-share arrangement and because plan options and deductibles have never been subject to collective bargaining or binding arbitration.

That same day, the County also filed a cross-motion for summary judgment and an opposition to Appellants' motion for summary judgment. In its motion, the County argued that Appellants' "case rests on an excessively broad—and fundamentally incorrect— reading of the Court's opinion in *Atkinson I*[.] . . . Nothing in *Atkinson I*, or in Charter §§ 811 or 812, precludes the Council from delineating the scope of collective bargaining with respect to health insurance benefits for County employees."

The County asserted that the prior version of § 6-1-308 (enacted in 1989), *see supra* note 10, "clearly reflected the Council's limit on collective bargaining about health benefits to only the cost-sharing arrangement." The County maintained that the current version of § 6-1-308 kept the status quo: the cost-sharing is still subject to collective bargaining and plan design and options were never part of collective bargaining. Additionally, the County contended that Appellants were wrong to read §§ 811 and 812 of the Charter together to mean that "the County must engage in collective bargaining over *all* terms and conditions of employment, including all aspects of health care benefits." The County asserted that the County Council, by implication, "retains the power to 'flesh out' the scope of those terms and conditions [subject to binding arbitration]." Lastly, the County argued that Appellants'

15

interpretation of §§ 811 and 812 of the Charter limit the County Council's legislative power impermissibly under Article XI-A § 3 of the Maryland Constitution.

Following a hearing held on June 29, 2015, the court entered an order dated July 15, 2015, in which it denied the parties' cross-motions for summary judgment to allow the parties to develop the record. And, approximately six months later, following discovery, the parties renewed their cross-motions for summary judgment on January 6, 2016. The court addressed the cross-motions during a hearing on May 16, 2016, at which the parties stipulated that there were no genuine disputes of material fact.[12] The parties largely reiterated the same arguments.

The circuit court granted the County's motion for summary judgment and denied Appellants' motion for summary judgment in an order and memorandum opinion entered on June 9, 2016. In its written memorandum, the court stated:

> The question [] for this Court, is whether the usage of "terms and conditions of employment" in Charter Section 812 includes the selection and types of health insurance coverage[,] which would then require collective bargaining and[,] if necessary[,] the submittal to a neutral arbitrator on the issue. The Court believes that the scope of those terms and conditions is controlled by

---

[12] Counsel for Appellants represented to the circuit court that summary judgment was appropriate because "there is no dispute as to a material fact that prevents the Court from reaching and making a final decision on the legal issue that's before the Court, which is[,] did the County Council have the power in amending Section 6-1-308 by repealing it and it and reenacting it, did it have the power to withdraw from collective bargaining, healthcare and health benefit options[?]" Immediately prior to this, however, counsel for Appellants noted that, through discovery, Appellants learned "what we'd expected," that "healthcare had been a term and condition of employment that had been placed in collective bargaining agreements between the County for years[,]" and that "even the County's chief deputy attorney, David Plymyer (ph.), had written in a memorandum dated October 3rd, 2011 that the terms and conditions with respect to healthcare for current employees as opposed to retirees is a mandatory subject of bargaining as a term or condition of employment[.]" The parties continue to dispute these facts on appeal.

16

the County and, once the scope is established, the parties follow Charter Section 812.

Interpreting the charter amendment is the appropriate place to begin. The primary focus of charter interpretation is to determine the intent of the charter amendment. *Mayor & City Council of Ocean City v. Bunting*, 168 Md. App. 134, 141 (2006). The language of the amendment is the starting point and if the language of the amendment is plain and unambiguous, there is no need to delve further. *Id.* **The Court believes the language is not plain and unambiguous. First, the charter amendment[,] in relevant part[,] fails to describe what is meant by "terms and conditions." Section 6-4-111 of the Code, which implemented the binding arbitration requirement of Charter Section 812 also fails to clarify the phrase. This Court believes that because the statutes in question fail to illuminate the exact intent and meaning of the phrase "terms and conditions of employment," it is necessarily up to the County Council to define the scope by legislation.** *Bunting*, 168 Md. App. at 141.

(Emphasis added).

Appellants noted their timely appeal to this Court on June 24, 2016.

## DISCUSSION

Appellants assign error to the circuit court's decision to defer to the County Council's interpretation of the phrase "terms and conditions of employment." This deference, Appellants argue, led the circuit court to decide incorrectly that Bill 85-13 did not violate Charter §§ 811 and 812 by excluding employee health insurance benefit options from the charter-mandated process of collective bargaining and binding arbitration. The County, for its part, insists that Charter § 812 does not require terms and conditions of employment to be bargained over in the first place but "merely directs the arbitrator to take into account the reasonable interests of both the County and law enforcement employees related to the terms and conditions of employment." Further, it argues that we must interpret Charter § 812 so that its effect is limited to budgetary issues and not legislative

issues, meaning that the County must only negotiate the "costs" of health insurance benefits. Consistent with this, the County reasons that defining "terms and conditions of employment" is the County Council's legislative prerogative—not a matter of charter material that affects the structure and form of government and may be controlled by Charter § 812—and to construe Charter § 812 otherwise would violate Article XI-A, § 3 of the Maryland Constitution.

## I.

## Charter Amendments and Our Standard of Review

Anne Arundel County adopted charter home rule in 1964. M. Peter Moser, *County Home Rule – Sharing the State's Legislative Power with Maryland Counties*, 28 Md. L. Rev. 327, 333 n.19 (1968). Article XI-A of the Maryland Constitution, which the General Assembly passed in 1914 and voters ratified in 1915, provides for home rule by charter. 1914 Md. Laws, ch. 416. Section 2 of Article XI-A requires the General Assembly to grant, through public general law, express powers to charter counties to enact public local laws. The General Assembly, not the charter counties, may "enlarge[] or extend[]" the grant of legislative powers to the charter counties. Article XI-A, § 2. These express powers are codified at Maryland Code (2013, 2017 Supp.), Local Government Article ("LG"), § 10-101 *et seq.*

Judge Levine, writing for the Court of Appeals in *Ritchmount P'ship v. Bd. of Sup'rs of Elections for Anne Arundel Cty.*, explained:

> Article XI-A, s[ection] 1 effectively reserves to the people of this state the right to organize themselves into semi-autonomous political communities for the purpose of instituting self-government within the territorial limits of the

18

several counties. The means by which the inhabitants acquire such autonomy is the charter. Being, in effect, a local constitution, the charter fixes the framework for the organization of the county government. It is the instrument which establishes the agencies of local government and provides for the allocation of power among them.

283 Md. 48, 58 (1978) (internal citations omitted). The Court of Appeals has stated repeatedly, "'a county charter is equivalent to a constitution.'" *Save Our Streets v. Mitchell*, 357 Md. 237, 248 (2000) (citations omitted). We interpret charters "under the same canons of construction that apply to the interpretation of statutes." *O'Connor v. Balt. Cty.*, 382 Md. 102, 113 (2004). Our guiding principle in doing so is to ascertain the drafters' intent in amending the charter. *See id.* at 113-14. "To determine what that intention was, we look first to the language of the amendment." *Mayor & City Council of Ocean City v. Bunting*, 168 Md. App. 134, 141 (2006) (construing amendment to municipal charter authorized under Article XI-E, §§ 3 and 4 of the Maryland Constitution). "If the meaning of the amendment is plain and unambiguous, we need look no further." *Id.*

When the text invites multiple interpretations, however, we must turn to the various interpretive tools at our disposal to resolve the resulting ambiguity. For instance, we consider the practical result of our decision, seeking to "'avoid constructions that are illogical, unreasonable, or inconsistent with common sense.'" *Id.* at 142 (citation omitted). We may also look to the greater context surrounding the enactment—its legislative history; other contemporaneous enactments by the drafters; and similar provisions in other counties, the state code, and, if relevant, federal law on the subject—to distill a more complete understanding of the drafters' intent. *See id.* at 143-146; *Mayor & City Council of Balt. v. Balt. City Firefighters Local 743, I.A.F.F.*, 136 Md. App. 512, 528-29 (2001)

[hereinafter "*Firefighters II*"]. In so construing charter provisions, we must avoid unconstitutional results. *Bunting*, 168 Md. App. at 146.

In the instant case, the parties urge us to review the lower court's grant of summary judgment under a *de novo* standard, each alleging there are no material facts in dispute. As an initial matter, when reviewing a circuit court's grant of summary judgment, this Court must, as a threshold matter, determine "whether a genuine dispute of material fact exists[.]" *Remsburg v. Montgomery*, 376 Md. 568, 579 (2003). In reviewing determinations of law, "we review the Circuit Court's decisions without deference to determine whether the conclusions involving ordinance construction were correct legally." *Fraternal Order of Police, Montgomery Cty., Lodge 35 v. Montgomery Cty.*, 437 Md. 618, 631 (2014).

## A. The Structure of §§ 811 and 812

As an initial matter, the parties disagree over what Charter §§ 811 and 812 require. Appellants assert throughout their briefing the general premise that Charter §§ 811 and 812 require the County, through a two-step process, "to bargain and arbitrate over 'terms and conditions of employment.'" The County argues in response that "terms and conditions of employment" are not mandatory bargaining subjects but simply considerations for the arbitrator: "Section 812 merely directs the arbitrator to take into account the reasonable interests of both the County and law enforcement employees related to the terms and conditions of employment." We begin with an analysis of the general structure and effect of Charter §§ 811 and 812.

Charter § 811 grants, broadly, County public safety employees "the right to organize and bargain collectively . . . as provided by ordinance of the County Council." And Charter

20

§ 812 provides rights "[i]n addition to the right granted to County employees in Section 811[.]" Section 812 mandates that the County Council "provide by ordinance for binding arbitration . . . in order to resolve labor disputes[,]" and that the ordinance "shall provide for the appointment of a neutral arbitrator . . . who shall issue a binding decision . . . [,] which shall take into account the financial condition of the County and the reasonable interests of the [County] employees and the county relating to the terms and conditions of employment."

Reading the two Charter provisions together, Charter § 811 provides for collective bargaining, and "in the event of an impasse in collective bargaining with public safety employees," *Atkinson I*, 428 Md. at 748, Charter § 812 mandates that the County must submit any "labor disputes" to binding arbitration. The arbitrator resolves the disputes considering the County's financial condition on the one hand and the terms and conditions of the public safety employees' employment on the other.

The County's argument that Charter § 812 does not require bargaining over the "terms and conditions of employment" ignores the canon of statutory construction by which "[a]ll parts of a statute are to be read together to determine intent, and reconciled and harmonized to the extent possible." *Condon v. Univ. of Md.*, 332 Md. 481, 491 (1993). To the extent the later-enacted mandate of Charter § 812 requiring arbitration over "terms and conditions of employment" is more specific than the general collective bargaining requirement of § 811 and can be said to alter the overarching scheme as it existed prior to its enactment, we "should give effect to the specific statute in its entirety and should retain as much of the general statute as is reasonably possible." *State v. Ghajari*, 346 Md. 101,

21

116 (1997) (citation omitted). Reading Charter §§ 811 and 812 together, the County's argument loses salience. In interpreting charters, as with statutes, we must avoid interpretations that produce illogical results. *Bunting*, 168 Md. App. at 142. It is unnatural and would ignore logic to read Charter § 812 to require arbitration over terms and conditions of employment during the second step of labor negotiations if those terms and conditions of employment were not subject to collective bargaining during the first step of the process. The more natural reading of Charter §§ 811 and 812 is advanced by Appellants and was accepted by the circuit court below: terms and conditions of employment are subject to a two-step process of collective bargaining and arbitration.

Our reading is consistent with what the County Council's contemporaneous legislative acts indicate the Council understood the process to be. Bill 1-03, which the Council drafted to implement Charter § 812 shortly after the voters amended the Charter, defined an "impasse" as "when the Administration and exclusive representative are unable to agree on the wages, hours, working conditions, or *other terms and conditions of employment* to create a memorandum of agreement after a reasonable period of negotiations." 2003 Laws of Anne Arundel Cty., Bill No. 1-03, § 4-101(j) (enacted March 24, 2003) [hereinafter "Bill No. 1-03"] (emphasis added).

### B. "Terms and Conditions of Employment"

Having resolved that Charter §§ 811 and 812 impose a structure that requires the County to bargain collectively over and, if necessary, submit to binding arbitration any

22

labor disputes concerning the terms and conditions of public safety workers' employment, we now turn to what is meant by "terms and conditions of employment."

## 1. The Parties' Arguments

Appellants contend that the circuit court erred when it deferred to the County Council to define the scope of "terms and conditions of employment" by legislation instead of applying the plain meaning of the phrase. They assert that Charter § 812 changed the form and structure of County government, removing from the County Council the authority to determine the scope of the "terms and conditions" of public safety workers' employment. According to Appellants, in the context of labor law, "terms and conditions of employment" is a term of art with a plain meaning that includes health insurance benefits. Based on this reading of Charter § 812, Appellants assert that the County Council lacks the authority to exclude from collective bargaining Appellants' health insurance options and plans. This Court asked Appellants at oral argument how and where the line is drawn between those facets of public health insurance benefits that are subject to collective bargaining and arbitration pursuant to Charter §§ 811 and 812 and those that are not. Appellants' counsel responded, "What we should have the right to bargain about is the economics of the features of the plan." More specifically, Appellants urged us to adopt the balancing test, set out *infra*, that the Court of Appeals endorsed in *Montgomery Cty. Ed. Ass'n, Inc. v. Bd. of Ed. of Montgomery Cty.*, 311 Md. 303 (1987) [hereinafter "*MCEA*"].

The County responds that Appellants' reading of Charter § 812—that every term and condition of employment is subject to collective bargaining—is unreasonably broad.

23

Instead, the County submits that defining terms and conditions is the County Council's legislative function under § 3 of Article XI-A and LG §§ 10-303(d) and 10-206(a)(2)[13] and that Charter § 812 merely directs the arbitrator to weigh those terms and conditions against the County's budgetary interests. The County also complains that there is no legal basis requiring it to allow union employees to bargain for a separate subsidy for each health insurance plan option (Bill 85-13 limits collective bargaining on employees' health insurance benefits to the employer subsidy with the lowest-cost health insurance plan).

At oral argument, when this Court pressed the County on how narrowly the Council could define "terms and conditions of employment," the logical conclusion of its argument became clear: it believes the Charter only requires it to negotiate the issue of wages. Although Bill 85-13 requires the County to negotiate over the fixed-dollar contribution to health insurance benefits, the County represented that, under its theory, the Council could also remove *all* aspects of healthcare from collective bargaining—including the fixed-dollar contribution. Appellants' only recourse to the Council doing so, the County suggested, would be "the ballot box." The County posited that wages are the exception because they are "so intertwined with the contractual relationship" between employer and employee that we may infer from "general labor law" that they are a mandatory subject of bargaining. On rebuttal, Appellants warned that under the County's proposed reading, "the

---

[13] LG § 10-206(a)(2) provides that "[a] county council may pass any ordinance, resolution, or bylaw not inconsistent with State law that: . . . (2) may aid in maintaining the peace, good government, health, and welfare of the county."

LG § 10-303(d) provides that "[a] county may provide for a merit system governing the appointment of county officials and employees not elected or appointed under the Maryland Constitution or public general law."

24

playing field is defined not by the process of negotiation, but by the County itself defining which [] the lowest cost plan [is] and what the lowest cost is."

## 2. Defining the Scope of the Charter Provisions

In *Firefighters II*, *supra*, this Court considered whether two contract provisions were arbitrable under the Baltimore City Charter,[14] which—much like the County Charter here—required the city and its firefighters "to submit to binding arbitration 'terms and conditions of employment.'" 136 Md. App. at 515. The union in that case sought two provisions that the City rejected: "(1) a 'parity provision'—under which the Firefighters would receive pay and benefits equal to that of paid police officers; and (2) the 'rule of one'—a method used to determine promotions for individual Firefighters based solely upon certain test scores." *Id.* Under Baltimore City's arbitration process at the time, the bargaining parties each submitted a proposal and a panel of arbitrators chose between them. *Id.* The City filed a complaint in circuit court seeking to enjoin the arbitration, contending that the two proposals at issue violated the City Charter and the City code. *Id.* at 516-17. "Specifically, the City asserted that the parity provision 'impermissibly restrict[ed] and interfere[d] with the City's ability to negotiate directly and in good faith with both the police and fire unions[,]'" and that "the rule of one would interfere with the authority of, and violate the rules and regulations established by, the City's Department of Personnel [] and the [City's Civil Service] Commission." *Id.* at 517. The circuit court dismissed the

---

[14] Baltimore City's charter predates the 1915 adoption of the Home Rule Amendments, *see, e.g.*, *Rossberg v. State*, 111 Md. 394 (1909); *see also* Dan Friedman, *The Maryland State Constitution* 297-98 (G. Tarr ed. 2011).

City's complaint, deciding that the question of which issues are arbitrable under the City Charter "was not for the court to decide, but rather, for the board of arbitrators and that 'a court of competent jurisdiction does not have jurisdiction until the matter is adjudicated in arbitration.'" *Id.*

On appeal, this Court began by holding that whether "the issues submitted to arbitration were [] 'terms and conditions of employment'" within the meaning of the City Charter was a justiciable issue for the courts to decide. *Id.* at 521. We instructed that "it is for the court to decide whether there exists an agreement to arbitrate on the subject matter of dispute." *Id.* And although we did not need to reach the issue, we suggested that we were inclined to believe "that the arbitration was not required before the court could determine arbitrability of these issues[.]" *Id.* at 521-22.

Moving on to whether the proposed contractual terms fell within the City Charter's requirement that the parties arbitrate "terms and conditions of employment," we agreed with the unions that the mandate "is broad, and on its face clearly encompasses a parity provision." *Id.* at 529. We rejected the City's argument that the parity provision would affect its negotiations with the police because the City had finite budgetary resources, reasoning that regardless of parity, resources allotted to one department affected those that the City could allot to the other and unions could use the other department's allotment as a bargaining chip. *Id.* Further, we reasoned, "[s]ubmitting the issue of parity to arbitration does not mean that the City has no opportunity to present evidence and argue before the arbitrators that, under current conditions, parity with the police is an unwise or undesirable provision." *Id.* at 531. Thus, we concluded, the issue of whether the firefighters were

26

entitled to the same wages and benefits as the police was a proper subject of arbitration because it was a "term and condition of employment" under the City Charter. *Id.*

As for the "rule of one," we determined that the record was too sparse to determine the issue, but before we remanded, *id.* at 515, we noted some relevant points from the parties' previous dispute in *City of Balt. v. Balt. Fire Fighters Local 734, I.A.F.F.*, 93 Md. App. 604 (1992) [hereinafter "*Fire Fighters I*"]. We observed that in *Fire Fighters I*, this Court held that "notwithstanding the broad language" in the City Charter, "some management rights are excluded from the scope of the arbitration clause." *Firefighters II*, 136 Md. App. at 536 (citing *Fire Fighters I*, 93 Md. App. at 617). In *Fire Fighters I*, the unions had argued that (1) a reduction in staffing levels and (2) accrued vacation leave were disputes that involved "terms and conditions of employment" within the meaning of the City Charter. *Id.* Before resolving the parties' dispute, this Court noted the tension that exists between management prerogatives and a mandate to negotiate and arbitrate labor disputes. *Id.* at 537 (citing *Fire Fighters I*, 93 Md. App. at 619-20). We rejected the parties' "'extreme positions'" and adopted an approach consistent with the Court of Appeals' reasoning in *MCEA*, 311 Md. 303,[15] holding that "'[t]he interests of the

---

[15] In *MCEA*, the designated representative of Montgomery County education employees, MCEA, challenged the county's refusal to submit to collective bargaining two issues: the school calendar and the reclassification of staff positions. 311 Md. at 306. The governing statutory provision, Maryland Code (1978, 1985 Repl. Vol.), Education Article ("EA"), § 6-408(b)(1), required public school employers to meet and negotiate "on all matters that relate to salaries, wages, hours, and other working conditions." *Id.* at 313. Aside from the slightly different textual mandate, *MCEA* also involved deference to an administrative agency rather than *de novo* review. *Id.* at 308-10. Additionally, the government-employer's negotiating interest in *MCEA* expanded beyond a budgetary

27

employees are to be balanced against the interest of the governmental entity, school system or firefighting system, as a whole.'" *Id.* Applying this balancing test, we concluded that both the reduction of staffing levels and accrued vacation leave issues were arbitrable. *Fire Fighters I*, 93 Md. App. at 622. Thus, in *Firefighters II*, we clarified that the balancing test is appropriate when the governing charter and code contain no expression of the enacting body's intent to make an issue arbitrable. 136 Md. App. at 538.

Five years after *Firefighters II*, this Court interpreted collective-bargaining amendments to the Ocean City Charter in *Bunting*, *supra*, 168 Md. App. at 136. There, we considered whether the Ocean City Council violated the Ocean City Charter when it adopted a labor code that excluded certain ranking officers from the collective bargaining process. *Id.* at 136. The applicable charter amendment (adopted the same year as Charter § 812) permitted police department "employees . . . to engage in collective bargaining with

---

interest; its interest also implicated statewide educational policy and the administration of public schools. *See id.* at 317-18.

"MCEA advanced a broad, literal interpretation of § 6-408(b)(1)," under which "any matter that relates, apparently even tangentially, to 'salaries, wages, hours, and other working conditions,' could be subject to collective bargaining." *Id.* at 306. The county "urged a narrower interpretation," under which the board itself would "determine and implement educational policy." *Id.* at 306-07. Noting that "no clear line distinguishes matters of educational policy from matters subject to collective bargaining[,]" the Court explained that both parties' extreme interpretation made little practical sense: "[V]irtually every managerial decision in some way relates to 'salaries, wages, hours, and other working conditions,' and is therefore arguably negotiable. At the same time, virtually every decision also involves educational policy considerations and is therefore arguably nonnegotiable." *Id.* at 316. The Court settled in the middle and adopted the State Board of Education's balancing approach, which "exempts from collective bargaining those matters that predominantly concern the determination of educational policy but preserves the local board's duty to negotiate matters of direct fundamental concern to employees." *Id.* at 316-17.

respect to 'the formulation and implementation of personnel policies affecting their employment[,]'" and instructed the city council to adopt a labor code establishing, *inter alia*, "units appropriate for collective bargaining." *Id.* The council, in turn, adopted a code with bargaining units that excluded officers of the rank of lieutenant or higher, effectively barring them from collective bargaining. *Id.* at 138. Several ranking officers challenged the labor code provision, requesting a declaration that it violated the charter amendment; Ocean City filed an answer and counter-complaint seeking a contrary declaration. *Id.* at 136-37. The circuit court sided with the officers and declared that the provision violated the city charter. *Id.* at 137.

On appeal, we reversed, determining that the Ocean City Council acted "lawfully and within the powers conferred by its charter when it limited, in its labor code, the right to collective bargaining to officers below the rank of lieutenant." *Id.* at 149. First, we looked to the plain language of the charter amendment and concluded that it was "lexically and contextually ambiguous. It d[id] not state, for instance, that 'all' employees of the police department shall have the right to collectively bargain, but only that 'employees', in general, shall have that right." *Id.* at 141. Further, the charter amendment made this point implicitly by instructing the council "to 'provide by law a labor code' which shall include, among other things, '[t]he manner of establishing units appropriate for collective bargaining.'" *Id.* (citation omitted). The corollary of this right to determine appropriate bargaining units, we explained, was "the right to determine what is not." *Id.* at 141-42. Based on this, we reasoned that the charter "l[eft] to the Council the task of defining its scope by legislation." *Id.* at 141.

29

Acknowledging, however, that "th[e] charter verbiage, by itself, hardly present[ed] a compelling case for permitting Ocean City to exclude high-ranking officers from collective bargaining units[,]" we looked to the practical result of our decision, seeking to "'avoid constructions that are illogical, unreasonable, or inconsistent with common sense.'" *Id.* at 142 (citation omitted). We determined that excluding certain ranking officers from collective bargaining was logical, reasonable, and consistent with common sense, considering a captain and a lieutenant negotiate on the city's behalf during collective bargaining and would have "unresolvable conflicts of interest" otherwise. *Id.* at 142-43. In support of this point, we also looked to the National Labor Relation Act ("NLRA"), in which Congress had "recognized the unpalatable consequences that flow from extending collective bargaining rights beyond workers to their supervisors[.]" *Id.* at 143.

For additional context, we also compared other charter counties, observing that

[t]he approach taken by Montgomery County and Prince George's County, of using their codes to define the boundaries of what had been granted in their charters, may explain why no Ocean City Council member felt the need to inquire as to the precise scope of the collective bargaining amendment before it went to the voters. Presumably, it was believed that the Ocean City Council would handle this matter as other counties had, by enacting appropriate legislation. If nothing else, the approach taken by Montgomery County and Prince George's County provides a model for reading the Ocean City amendment as Ocean City does, while, at the same time, it underscores that there is no countervailing model supporting appellees' position.

*Id.* at 146. Ultimately, after suggesting that an opposite conclusion may render the amendment "legislative" in nature and, thus, unconstitutional, we held that Ocean City "act[ed] lawfully and within the powers conferred by its charter when it limited, in its labor code, the right to collective bargain to officers below the rank of lieutenant." *Id.* at 149.

30

Returning to the present case, Appellants rely on *Firefighters II* and the County relies on *Bunting*. We begin, as we did in *Firefighters II*, by holding that whether a negotiating topic is a "term and condition of employment" subject to the charter-mandated bargaining and arbitration process is a justiciable issue. *See* 136 Md. App. at 521. The County's position is that courts should leave defining the scope of what is negotiable under "terms and conditions of employment" to the County Council. However, this viewpoint is contrary to the cases in which we have determined the arbitrability of contractual terms under similar charter mandates. *See, e.g.*, *id*; *Fire Fighters I*, 93 Md. App. at 622. Unlike the provision at issue in *Bunting* that instructed the council to set forth the manner of establishing bargaining units, *id.* at 141-42, the mandate in Charter § 812 sets the subject matter of arbitration as "labor disputes" concerning "terms and conditions of employment," and limits the County Council's legislative authority to the construction of a scheme by which disputes are arbitrated and how the arbitrator is to be selected. Charter § 812 does not, for instance, instruct the Council to establish the subject matter of negotiations, which would include a corollary right to define "labor disputes" and "terms and conditions of employment." The County's position—that the Council may delimit what is meant by "terms and conditions of employment" so as to exclude everything but wages—is similar to the position it advanced in *Atkinson I*, wherein it argued the Council may choose not to fund a final arbitration award if the arbitrator chose the employees' final offer. 428 Md. at 742. Both create an "irreconcilable conflict" between Charter § 812's terms and the Council's asserted "power to modify or abrogate a binding award." *Id.* at 734-44. The Charter's mandate to bargain the "terms and conditions of employment" collectively would

31

have little effect if the County Council retained carte blanche authority to define the subject matter of negotiations so narrowly that the right to bargaining and arbitration becomes *de minimis*. We must, then, read Charter § 812 as imposing some limitation on the Council's legislative authority to define the scope of bargaining.

We hold that whether health insurance benefits are subject to the mandated bargaining and arbitration process under Charter §§ 811 and 812 is a justiciable issue, and that the circuit court erred when it decided that it was the County Council's legislative function, exclusively, to resolve any ambiguities in the phrase "terms and condition of employment" contained in Charter § 812.

### 3. Health Insurance Benefits as a "Term and Condition of Employment"

To determine whether the phrase "terms and conditions of employment" includes health insurance benefits, we look to the greater context surrounding the Charter's enactment, including how the phrase is employed elsewhere in labor law. *See*, *e.g.*, *Bunting*, 168 Md. App. at 142; *Firefighters II*, 136 Md. App. at 528-29.

In *Bunting*, we turned to federal law for guidance and explained that the NLRA helped demonstrate the illogic of including high-ranking officers within the meaning of "employees." 168 Md. App. at 143. In this case, despite the County's assertion that "general labor law" supports its narrow reading, the vast body of National Labor Relations Board ("NLRB") decisions and federal case law—sprawling over 70 years—hold

consistently that health insurance benefits are included within the meaning of "wages,

hours, and other terms and conditions of employment."[16]

---

[16] *See Oak Harbor Freight Lines, Inc. v. N.L.R.B.*, 855 F.3d 436, 438 (D.C. Cir. 2017) ("Pension and healthcare benefits are mandatory subjects of bargaining[]" under the NLRA's requirement that "employers bargain in good faith 'with respect to wages, hours, and other terms and conditions of employment'" (citation omitted)); *El Paso Elec. Co. v. N.L.R.B.*, 681 F.3d 651, 668 (5th Cir. 2012) (relying on an NLRB opinion that ruled "[d]ays off from work, whether sick days, holidays, personal days, or vacation days, health insurance, and working hours *clearly* are terms and conditions of employment, as are uniform and meal allowances, longevity pay, and premium pay for overtime," to hold that a meter collectors' boot allowance was a term and condition of employment that required mandatory bargaining under the NLRA); *Porta-King Bldg. Sys., Div. of Jay Henges Enterprises, Inc. v. N.L.R.B.*, 14 F.3d 1258, 1262 (8th Cir. 1994) (listing health insurance as a term and condition of employment subject to collective bargaining, along with wages, "attendance policies, and fewer holidays and benefits").

Courts have held that healthcare benefits, including employer subsidy, plan design, and timeframe for election of coverage, are subject to collective bargaining as terms and conditions of employment. *See, e.g.*, *N.L.R.B v. Atl. Int'l Corp.*, 664 F.2d 1231, 1232 (4th Cir. 1981) (describing a new requirement that employees contribute to the maintenance of their health insurance plans a change to "terms and conditions of employment"); *Clear Pine Mouldings, Inc. v. N.L.R.B.*, 632 F.2d 721, 729-30 (9th Cir. 1980) (ruling that "[h]ealth care plans are mandatory subjects of bargaining" under the NLRA, and holding that a company's unilateral, material changes to health care benefits violates the Act); *Keystone Steel & Wire, Div. of Keystone Consol. Indus. v. N.L.R.B.*, 606 F.2d 171 (7th Cir. 1979) (setting out a case-by-case approach to determine whether a change in retirement, pension, or health-care benefits materially or significantly affected wages or other conditions of employment under the NLRA and holding that a switch in healthcare plan administrators resulted in other changes that had a material and significant impact of "the terms and conditions of employment"); *Conn. Light & Power Co. v. N.L.R.B.*, 476 F.2d 1079, 1081-83 (2d Cir. 1973) (noting that "[i]t is well established that included within the [mandatory subjects of bargaining under the NLRA] are such 'non-wage' benefits as the group health insurance [t]here involved[,]" but holding that the company's change in health insurance carriers was not subject to collective bargaining because the change in carrier did not affect "the bargained-for terms of the employee insurance plan"); *Bastian-Blessing, Div. of Golconda Corp. v. N.L.R.B.*, 474 F.2d 49, 52-54 (6th Cir. 1973) (ruling that "[h]ealth insurance benefits clearly represent mandatory subjects for bargaining[,]" and holding that the company's unilateral change in insurance providers was a "change in conditions of employment" under the NLRA because the record revealed that the new plan did not offer the same levels of coverage as the previous plan); *W.W. Cross Co. v.*

In 1935, Congress enacted the NLRA, which "declared it an unfair practice for the employer to refuse to bargain collectively[,]" but it did not "define the subjects of collective bargaining[.]" *Ford Motor Co. v. N.L.R.B.*, 441 U.S. 488, 495 (1979) (citing Act of July 5, 1953, 49 Stat. 435). The NLRA did, however, "ma[k]e the union selected by a majority in a bargaining unit the exclusive representative of the employees for bargaining about 'rates of pay, wages, hours of employment, or other conditions of employment.'" *Id.* Then, in 1947, Congress amended the NLRA, adopting § 8(d) to "explicitly define[] the duty of both sides to bargain as the obligation to 'meet at reasonable times and confer in good faith with respect to wages, hours, *and other terms and conditions of employment*[.]'" *Id.* (quoting 61 Stat. 142, codified at 29 U.S.C. § 158(d)) (emphasis added). The Supreme Court noted in *Ford Motor Co.* that the original House bill contained a list of specific bargaining subjects that "was rejected in conference in favor of the more general language adopted by the Senate and now appearing in § 8(d)." *Id.* at 495-96. The Court reasoned that this change made it "evident that Congress made a conscious decision to continue its delegation to the [NLRB] of the primary responsibility of marking out the scope of the statutory language and of the statutory duty to bargain." *Id.* at 496; *see also Allied Chem. and Alkali Workers of Am., Local Union No. 1 v. Pitt. Plate Glass Co., Chem. Div.*, 404 U.S. 157, 164, 178 (1971) (explaining that the phrases "wages, hours, and other terms and conditions of employment," as opposed to an "immutably fix[ed]" "list of subjects for

---

*N.L.R.B.,* 174 F.2d 875, 878 (1st Cir. 1949) (holding that "'wages'" in the NLRA "embraces within its meaning direct and immediate economic benefits flowing from the employment relationship[, and] covers a group insurance program").

mandatory bargaining," limits bargaining to "only issues that settle an aspect of the relationship between the employer and employees").

Construing what these "other terms and conditions of employment" include, the Supreme Court has upheld the NLRB's decision that the amount of sick leave that employees receive falls within this definition. *N.L.R.B. v. Katz*, 369 U.S. 736, 744 (1962). It has also reasoned that, "[t]o be sure, the future retirement benefits of active workers are part and parcel of their overall compensation and hence a well-established statutory subject of bargaining." *Allied Chem.*, 404 U.S. at 180. Additionally, the Court has upheld an NLRB decision that "in-plant food prices and services are mandatory bargaining subjects."[17] *Ford Motor Co.*, 441 U.S. at 497. We can extrapolate from these decisions that the Court does not consider managerial decisions to be subject to bargaining but that employee benefits generally are.

State labor law also supports the conception that employee health insurance benefits are considered a "term and condition of employment." At the time of Charter § 812's drafting and passage, the phrase "terms and conditions of employment" was already employed in the Maryland Code in the context of collective bargaining. Title 3 of the State Personnel & Pensions Article provided certain State employees the right to bargain

---

[17] In doing so, the Court in *Ford Motor Company* noted that food prices did not implicate a "managerial decision," and looked to both industry-wide practice and the employer's decision to provide for the sale of food during working hours: "where the employer has chosen, apparently in his own interest to make available a system of in-plant feeding facilities for his employees, the prices at which food is offered and other aspects of this service may reasonably be considered among those subjects about which management and union must bargain." *Id.* at 498-500.

collectively—defined as "good faith negotiations by authorized representatives of employees and their employer with the intention of . . . reaching an agreement about wages, hours, and other terms and conditions of employment[.]"  Maryland Code (1993, 1997 Repl. Vol., 2002 Supp.), State Personnel & Pensions Article ("SP&P"), §§ 3-101, 3-301. *See also* SP&P § 3-502 (mandating that the matters to be negotiated "shall include all matters relating to wages, hours, and other terms and conditions of employment.") Interpreting SP&P § 3-502, the State Labor Relations Board has upheld an administrative law judge's opinion "that employee health insurance benefits are a mandatory subject of bargaining under [this collective bargaining statute]."  *In re: Md. State Emp. Union, Am. Fed'n of State, Cty. & Mun. Emps., Council 92 v. Ehrlich*, SLRB ULP Case No. 05-U-01, 2005 WL 6193427, *1 (March 11, 2005); *see also Md. Transp. Auth. v. Md. Transp. Auth. Police Lodge No. 34 of FOP*, 420 Md. 141, 159 (2011) (holding that an agreement by which officers received take-home vehicles from the State was a proper subject of collective bargaining under SP&P § 3-502 because it concerned wages, hours, and other terms and conditions of employment).

Contrary to the situation in *Bunting*, here, the County offers "no countervailing model supporting [its] position."  168 Md. App. at 146.  Our 2001 decision in *Firefighters II* (one year before voters adopted Charter § 812) "agree[d] with the Unions that the requirement in section 55 of the Charter that the City [of Baltimore] arbitrate issues 'concerning the terms and conditions of employment' [wa]s broad, and on its face clearly encompasse[d] a parity provision[,]" under which the "pay *and benefits*" of firefighters would equal that of police officers.  136 Md. App. at 515, 529 (emphasis added).  The

36

County Charter's mandate here is similarly broad enough to encompass Appellants' health insurance benefits.[18]  Therefore, having considered the intent of the drafters of Charter § 812, how the phrase "terms and conditions of employment" is used in labor law statutes dating back to the 1930s, and the interpretations of state and federal courts, we conclude that "terms and conditions of employment" is a term of art that includes health insurance benefits.

### 4.  Charter Material vs. Legislative Material

The County argues that any decision that the terms of art employed in Charter § 812 include health insurance benefits would impermissibly strip the County Council of its legislative discretion to limit what terms and conditions of employment are subject to collective bargaining.  *See Bunting*, 168 Md. App. at 146 ("[T]he canons of construction require us to construe a statute or charter amendment so that it is not unconstitutional or otherwise illegal.").  It contends that *Atkinson I* stands for the proposition that an arbitration mandate is proper charter material only if it relates to budgetary issues. According to the County, defining the subject matter of collective bargaining agreements is legislative in nature and not proper "charter material" under Article XI-A, § 3, which vests this legislative power with the county council of the charter county.

---

[18] The contemporaneous acts of the drafters of Charter § 812 demonstrate that the intent was to mandate collective bargaining over more than wages.  As discussed above, after drafting the resolution that proposed Charter Amendment § 812, the County Council drafted Bill 1-03, which defined an impasse as "when the Administration and exclusive representative are unable to agree on the **wages, hours, working conditions, or other terms and conditions of employment** to create a memorandum of agreement after a reasonable period of negotiation."  Bill 1-03. (Emphasis added).

A progeny of Court of Appeals' decisions beginning with the Court's seminal decision in *Cheeks v. Cedlair Corp.*, 287 Md. 595 (1980), help explain the distinction between proper charter material and material left to the local legislature. In *Cheeks*, the Court explained that a charter is "a permanent document intended to provide a broad organizational framework establishing the form and structure of government in pursuance of which the political subdivision is to be governed and local laws enacted." *Id.* at 607. Accordingly, "a charter amendment within the context of Art. XI-A is necessarily limited in substance to amending the form or structure of government initially established by adoption of the charter." *Id.* "Its content cannot transcend its limited office and be made to serve or function as a vehicle through which to adopt local legislation." *Id.* (citation omitted). The charter amendment at issue in *Cheeks* created a comprehensive system for regulating rent in addition to creating a City agency with authority over landlord and tenant matters. *Id.* The Court concluded that the amendment was legislative and in violation of Article XI-A. *Id.* at 610.

Four years later, the Court of Appeals addressed this same legal question in *Griffith v. Wakefield*, 298 Md. 381 (1984). There, a group of Baltimore County residents argued that a proposed charter amendment was impermissibly legislative. *Id.* at 382. The amendment imposed a detailed scheme for the arbitration of labor disputes between the County and county-employed firefighters—including the procedures to select a three-member board of arbitrators, "the board's powers, the procedures to be followed by the board, and the factors to be taken into account by the board in making its award." *Id.* at 383. Applying its holding in *Cheeks*, the Court held that the proposed charter amendment

38

violated Article XI-A because the amendment "prescribe[d] 'in lengthy detail' an entire system of binding arbitration for a select group of county employees; it le[ft] nothing for the determination of the County Executive or the County Council." *Id.* at 386 (footnote omitted). It characterized the proposal as an attempt by the electorate to use the charter process "to circumvent the local legislative body and enact local law." *Id.* at 388; *see also Bunting*, 168 Md. App. at 146-47 (holding that, although the charter mandated collective bargaining for police department "employees," the legislature did not violate the charter by prohibiting certain ranking officers from bargaining because the decision "[wa]s not only specific but technical in nature").

Then, in *Smallwood*, the Court upheld proposed charter amendments in Baltimore County and Anne Arundel County that "placed a percentage cap on the amount of local property tax revenues to be raised each year."[19] *Bd. of Sup'rs of Elections of Anne Arundel Cty. v. Smallwood*, 327 Md. 220, 236 (1992). In holding that the amendments were "proper charter material," the Court distinguished *Cheeks* and *Griffith*, reasoning that the tax limitation amendments did not "suffer from the same weakness" as in those cases:

> These proposed tax limitation amendments were not back-door attempts by the voters of Baltimore and Anne Arundel Counties to enact detailed legislation. Nor did they divest the county councils of the ability to set the property tax rates. Rather, each would have merely precluded a particular

---

[19] The Court in *Smallwood* also considered a charter amendment in Anne Arundel County that "would have given the voters of Anne Arundel County the power to initiate legislation which would not be subject to the veto power of the County Executive, and which could only be amended or repealed by an affirmative vote of all seven members of the county council." 327 Md. at 232. The Court held that this proposal was unconstitutional, reasoning that "the voters of a charter county cannot reserve to themselves the power to initiate legislation because such initiative conflicts with the terms of Art. XI-A, § 3, of the Maryland Constitution." *Id.* at 236.

type of enactment by the legislative body, namely the power to collect property taxes above the specified cap.

*Id.* at 237, 240; *see also Save Our Streets*, 357 Md. 237, 253 (2000) (explaining that the proper focus when deciding whether a charter amendment is impermissibly legislative "is the degree to which the county council retains discretion and control regarding an area under its authority pursuant to Article XI-A of the Maryland Constitution").

More recently and pertinent to this appeal, the Court in *Atkinson I* addressed the constitutionality of Charter § 812. It began by noting that it is "settled that binding arbitration is an appropriate subject matter for inclusion in a county charter." 428 Md. at 745. Specific to Charter § 812, the Court concluded that the voters' directive "for the Council to implement, in some fashion, binding arbitration in the budget process, does not implicate, on analysis, the lawmaking power of the Council under Const., Art. XI-A, § 3." *Id.* at 748. The Court explained the distinction at play that rendered Charter § 812 charter material, rather than legislative material:

> Once the voters, acting under Const. Art. XI-A, § 1, made the policy decision, Charter § 812 left all of the detail of implementation to the Council for the exercise of its Art. XI-A, § 3 law-making power in Bill 1-03. It covered possible mediation, each step in the selection of the neutral arbitrator, timing, the powers of the arbitrator, receipt of final offers of each party, ten factors to be considered by the arbitrator after receiving evidence, the final, binding award, possible revision thereof by agreement, post-hearing motion or court action, and implementation of the award as part of the budget process.

*Id.* at 749-50.

Thus, the Court held "that Charter § 812 did not unconstitutionally preclude the exercise of the County Council's law-making discretion." *Id.* at 750. Finding Bill 4-11 to

40

be in conflict with Charter § 812, the Court offered the following in conclusion:

> The voters of Anne Arundel County determined in Charter § 812 that the County Council would not have discretion to reject the effect of binding arbitration. The total repeal of Code § 6-4-111 that is attempted by Sec. 3 of Bill 4-11 violates Charter § 812 and is of no effect. Consequently, County Code § 6-4-111 stands as [previously] enacted by Bill 1-03 and amended by Bill 88-10.

*Id.* at 755.

Returning to the instant case, interpreting Charter § 812 to require the County to negotiate terms and conditions of employment beyond wages is consistent with the foregoing decisional law. Unlike *Cheeks* and *Griffith*, Charter §§ 811 and 812 do not legislate a detailed scheme. We recognize, as the Court of Appeals did in *Save Our Streets*, that the length and detail of the charter provision is not dispositive and focus instead on "the degree to which the county council retains discretion and control regarding an area under its authority pursuant to Article XI-A of the Maryland Constitution." *Save Our Streets*, 357 Md. at 253. Charter §§ 811 and 812's mandate that the County Council create a system through which the County must submit to binding arbitration over not only the wages of public service employees, but also the health insurance benefits that accompany those wages, does not infringe on the "technical" policy concerns left to the legislature. *Cf. Bunting*, 168 Md. App. at 146-47.

We note, however, that the authority to legislate and implement voters' policy determinations reflected in the Charter inherently affords the County Council some room to interpret the terms of the governing charter provisions. This leeway generally takes the form of constructing the "technical" specifics of the policy, which we have come to know

41

as the "legislative material." The Court of Appeals' decision in *Atkinson I* provides an

example of what a legislative scheme looks like under Charter § 812:

> It covered possible mediation, each step in the selection of the neutral arbitrator, timing, the powers of the arbitrator, receipt of final offers of each party, ten factors to be considered by the arbitrator after receiving evidence, the final, binding award, possible revision thereof by agreement, post-hearing motion or court action, and implementation of the award as part of the budget process.

428 Md. at 749-50. By contrast, here, rather than simply constructing a legislative scheme

to implement Charter § 812 as it did in Bill 1-03, the Council went further in Bill 85-13

and narrowed the scope of the Charter provision it sought to implement. As in *Atkinson I*

where the Court decided that "[t]he voters of Anne Arundel County determined in Charter

§ 812 that the County Council would not have discretion to reject the effect of binding

arbitration[,]" 428 Md. at 755, we resolve that the voters also determined through Charter

§§ 811 and 812 that the Council cannot define and limit the subject matter of collective

bargaining and arbitration to a *de minimis* level.

Simply including in a collective-bargaining charter amendment the subject matter

that the County must bargain does not turn an otherwise permissible charter provision into

an impermissible legislative scheme.[20] There is a significant difference between a charter

---

[20] It is not the Charter, but the Council's own legislative scheme that set the bargaining units and structure of negotiations. Our prior cases have shown that there are alternative schemes available. In *Firefighters II*, Baltimore City used a parity provision to simplify negotiations and we noted recently that Baltimore County uses a "Heath Care Review Committee" as "the official bargaining agent as to healthcare issues for several unions for County employees, including the FOP." *Balt. Cty. v. Balt. Cty. FOP, Lodge No. 4*, 220 Md. App. 596, 601-02, *aff'd sub nom. Balt. Cty. v. FOP, Balt. Cty., Lodge No. 4*, 449 Md. 713 (2016).

provision that defines the general subject matter of arbitration and one that creates a comprehensive scheme for binding arbitration like the Court considered in *Griffith*, 298 Md. at 383-88. Here, the voters made a policy decision and "left all of the detail of implementation to the Council for the exercise of its Art. XI-A, § 3 law-making power[.]" *Atkinson I*, 428 Md. at 749-50. Accordingly, we hold that interpreting the phrase "terms and conditions of employment" in Charter § 812 to include health insurance benefits does not strip the County Council of its legislative discretion to enact a comprehensive scheme for collective bargaining and arbitration over health insurance benefits.

### C. Does Bill 85-13 Impermissibly Limit Appellants' Right to Bargain?

Having concluded that "terms and conditions of employment" as used in Charter §812 is a term of art that includes health insurance benefits, we finally reach the question of whether the amendments to § 6-1-308 of the Code made pursuant to Bill 85-13 comply with §§ 811 and 812 of the Charter.

We agree with Appellants that the right to bargain over the employer subsidy under the new law "is meaningless." Under Bill 85-13, all that the Appellants may "negotiate" is the percent of the County's contribution to the lowest-cost plan that the County will offer. The bill then caps the County's contribution to all other plans at the same dollar contribution it offers for the lowest-cost plan. Appellants have no say in choosing which plans the County will offer or how minimal the coverage will be in the lowest-cost plan— and thus no say in how much the lowest-cost plan will in fact cost. The bill grants the County Administrator the sole authority to make those decisions, leaving nothing meaningful to negotiate during the Charter-mandated collective bargaining and arbitration

43

process. Thus, we hold that the provisions of Bill 85-13 that effectively render meaningless Appellants' right to bargain collectively over the cost of their health insurance benefits are invalid under Charter §§ 811 and 812.

The question remains to what extent the County must engage in collective bargaining over health insurance benefits. After finding that the phrase "terms and conditions of employment" was not plain and unambiguous, the court erred by granting the County's motion for summary judgment, leaving the record in this case undeveloped. The record does not permit us to discern the scope of the health insurance benefits subject to negotiation in this case. Appellants' contention that the County must negotiate the "economic benefits" of the plans does not reveal to what extent their proposal would impinge on legitimate management prerogatives. *Cf. Fire Fighters I*, 93 Md. App. at 623. We recognize that Appellants' "interests here are not 'slight[,]'" s*ee id.* at 624 (quoting *MCEA*, 311 Md. at 320), but as we explained in *Fire Fighters I*, "[v]irtually every time in which an employer makes a concession to employees there is some 'financial' and/or 'operational' hardship to the employer." *Id.*

On the record before us, we simply cannot resolve the conflict between the parties' competing interests. As was the case in *Firefighters II*, 136 Md. App. at 515, we must remand for further proceedings. In *Firefighters II*, we clarified that the balancing test is appropriate when the governing charter and code contain no expression of the enacting body's intent to make an issue arbitrable. *Id.* at 538; *see also Fire Fighters I* (applying the balancing test set out in *MCEA*, 311 Md. at 322, to help determine the extent to which employee benefits are subject to collective bargaining and arbitration). We leave it to the

parties and trial court, applying the balancing test on remand, to ascertain the scope of collective bargaining rights over health insurance benefits as mandated under §§ 811 and 812 of the Charter. Our holding provides one end of the gamut—Charter §§ 811 and 812 prohibit the County from restricting Appellants' bargaining rights under Bill 85-13 to the *de minimis* level of "bargaining" only the subsidy tied to the lowest annual cost health insurance plan chosen by the County Administrator.[21]

In closing, we observe that the offending provisions of the law are likely severable. Severability is a question of legislative intent. *Sugarloaf Citizens Ass'n, Inc. v. Gudis*, 319 Md. 558, 573 (1990) (citation omitted). "Under Maryland law, '[t]here is a strong presumption that if a portion of an enactment is found to be invalid, the intent [of the legislative body] is that such portion be severed.'" *Montrose Christian Sch. Corp. v. Walsh*, 363 Md. 565, 596 (2001) (quoting *Smallwood*, *supra*, 327 Md. at 245). In this case, the County Council clearly intended its local laws to be severable. Section 1-1-106 of the Code provides:

> If any word, phrase, clause, sentence, paragraph, or section of this Code is declared invalid or unconstitutional by a court of competent jurisdiction, the invalidity or unconstitutionality shall not affect any of the remaining words, phrases, clauses, sentences, paragraphs, or sections of this Code because the remaining language would have been enacted without the incorporation in this Code of the invalid or unconstitutional word, phrase, clause, sentence, paragraph, or section.

In order to provide remedial flexibility, we leave it to the trial court to delineate the provisions of Bill 85-13 that are invalid, should the court decide that it is proper to strike

---

[21] We note that the injunction entered on March 13, 2015, remains in place until the resolution of this or any future appeals.

more than §§ 6-1-308(b)(2)-(4) and (i)(4)-(6) of the Code—the provisions stayed pursuant

to the March 13 order.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED AND CASE REMANDED TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**